1  LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   MONIQUE C. WINKLER (213031)
3  AELISH M. BAIG (201279)
   100 Pine Street, Suite 2600
4  San Francisco, CA  94111
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@lerachlaw.com
6  moniquew@lerachlaw.com
   aelishb@lerachlaw.com
7
   BARRACK, RODOS & BACINE
8  STEPHEN R. BASSER (121590)
   JOHN L. HAEUSSLER (215044)
9  402 West Broadway, Suite 850
   San Diego, CA  92101
10  Telephone:  619/230-0800
   619/230-1874 (fax)
11  sbasser@barrack.com
   jhaeussler@barrack.com
12
   Co-Lead Counsel for Plaintiffs
13
   [Additional counsel appear on signature page.]
14
                 UNITED STATES DISTRICT COURT
15
                NORTHERN DISTRICT OF CALIFORNIA
16
                        OAKLAND DIVISION
17
   In re NVIDIA CORP. DERIVATIVE      )   Master File No. C-06-06110-SBA
18  LITIGATION                         )
                                      )   CONSOLIDATED VERIFIED
19  _____       )   SHAREHOLDERS DERIVATIVE
                                      )   COMPLAINT
20  This Document Relates To:          )
                                      )
21     ALL ACTIONS.                    )
   _____       )   DEMAND FOR JURY TRIAL
22
23
24
25
26
27
28

**NATURE OF THE ACTION**

1.      This is a shareholders derivative action on behalf of nominal defendant NVIDIA Corporation ("NVIDIA" or the "Company") against its entire Board of Directors and certain current and former top officers (collectively, "defendants") for violations of federal and state law, including breaches of fiduciary duty, abuse of control, corporate waste, unjust enrichment and gross mismanagement.  Beginning when NVIDIA became a public company in 1999, certain current and former executives engaged in a secret scheme to grant undisclosed, in-the-money stock options to themselves and others by backdating stock option grants to coincide with historically low prices for NVIDIA's common stock and falsifying the Company's financial statements.

2.      As Securities and Exchange Commission ("SEC") Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs on September 6, 2006, "backdating" is a practice by which a stock option is publicly reported as having been granted on one date, but is actually backdated weeks or months to a date where the stock price was trading at a lower price.  Such backdating allows company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders.  Lynn Turner, the SEC's former Chief Accountant, described backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing: "It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

3.      By engaging in the backdating scheme, defendants were able to conceal that NVIDIA was not recording material compensation expenses and was materially overstating the Company's net income and earnings per share.  Defendants collectively realized $358.8 million in illicit compensation by selling shares of NVIDIA stock (which was artificially inflated), frequently through the exercise and sale of manipulated stock options.

4.      Moreover, each of the defendants knowingly violated the terms of NVIDIA's stock option plans by granting and/or receiving options at below fair market value prices, and participated in the concealment of the backdating option scheme by making false statements in NVIDIA's annual reports and proxy statements about the administration of NVIDIA's stock options and stock option

1    granting practices.  Defendants also have refused to take advantage of the Company's legal rights to

2    require these insiders to fully disgorge the illicitly-obtained incentive compensation and proceeds

3    diverted to them since 1999.

4                                        **INTRODUCTION**

5          5.      In recent months, over 100 companies have come under scrutiny for their stock option

6    granting practices.  On March 18, 2006, an article appeared in the *Wall Street Journal* entitled, "The

7    Perfect Payday – Some CEOs reap millions by landing stock options when they are most valuable;

8    Luck – or something else?"  The *Wall Street Journal's* analysis focused on financial filings from

9    several high-tech companies and was an extension of recent academic articles which suggested that

10   "backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the

11   1990s though the Sarbanes-Oxley corporate reform act of 2002."  While NVIDIA was not directly

12   implicated in the option-timing scandal at that point, that was soon to change.

13         6.      On August 10, 2006, NVIDIA was forced to admit that stock options had been

14   manipulated.  In announcing that the Company may restate its reported financial results for previous

15   years, NVIDIA stated that the Audit Committee of the Board of Directors "has reached a preliminary

16   conclusion that incorrect measurement dates were used for financial accounting purposes for stock

17   option grants in certain prior periods" – *i.e.*, that stock options did ***not*** carry an exercise price at fair

18   market value as of the date of the grant.  As a result, "NVIDIA may record additional non-cash

19   stock-based compensation expense related to stock option grants."

20         7.      Following this announcement, the situation at NVIDIA quickly deteriorated.  On

21   September 11, 2006, NVIDIA received a request from the SEC "that the Company provide them

22   with certain information relating to the Company's historical stock option practices."  NVIDIA also

23   disclosed that it would not file its quarterly report on Form 10-Q due to the ongoing stock option

24   probes.  Then, on September 12, 2006, NVIDIA announced that it has received a letter from the

25   Nasdaq stock market threatening NVIDIA with delisting of its common stock if the Company did

26   not file its second quarter 2007 Form 10-Q in a timely fashion.

27         8.      Finally, on November 1, 2006, NVIDIA announced the final results of its internal

28   stock options investigation.  The Company disclosed that it will restate its previously-issued

financial statements for the fiscal years 2004 through 2006, together with selected financial statements for earlier years, and for the first quarter of fiscal year 2007, to correct material errors related to accounting for stock-based compensation expense.

> NVIDIA Corporation today announced that it expects to restate its previously-issued financial statements for the **fiscal years 2004 through 2006**, together with selected financial statements for earlier years, and for the first quarter of fiscal 2007 that ended April 30, 2006 to **correct errors related to accounting for stock-based compensation expense**.

> The Company currently estimates . . . that the net impact of the restatement will be aggregate non-cash charges of **less than $150 million** for stock-based compensation expense, net of related tax effects.

> *        *        *

> The Audit Committee has reached a preliminary conclusion, based upon the recommendation of management, **that NVIDIA will need to restate its historical financial statements to record additional non-cash stock-based compensation expense related to stock option grants** as a result of errors in recording the measurement date for certain stock option grants. Accordingly, the Company advises that all of the Company's financial statements and related communications for periods commencing on or after January 31, 1999 should not be relied upon.

9.      Shortly thereafter, on November 29, 2006, NVIDIA filed its restated Form 10-K with the SEC, in which NVIDIA restated its financial statements for the fiscal years 2004 through 2006, together with selected financial statements for earlier years, and for the first quarter of fiscal year 2007. According to the Company, on a "number of occasions" the "measurement date used for financial accounting and reporting purposes for stock options granted to certain of our employees was different from the actual grant date." NVIDIA also disclosed that, as a result of the options scheme, the Company has recorded a stock-based compensation charge of **$190.2 million – nearly $41 million more than the amount originally disclosed**.

10.     Because NVIDIA is only obligated to disclose option grants to certain executive officers in its proxy filings, the full breadth of unlawful stock options and false financial reporting scheme is not yet known. However, a number of option grants to NVIDIA executives between 1999 and 2002 came at monthly and/or quarterly lows in NVIDIA's stock price. The odds of that happening by chance are extraordinarily remote.

11.     Two of the most egregious backdated stock option grants to defendants are detailed below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



12.     Defendants' backdating scheme not only surreptitiously and illegally lined defendants' pockets and caused NVIDIA to issue materially false financial statements, but undermined the key purpose of stock option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization.  By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, NVIDIA insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition – a situation which President George W. Bush recently declared "***bad for America***."

13.     The United States Senate has also decried the greed and exploitation of shareholders, including Senator Chuck Grassley who stated with regard to stock options backdating:

> It is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an "honest day's work for an honest day's pay" and replaces it with a phrase that we hear all too often today, "I'm going to get mine."  Even worse in this situation, most of the perpetrators had already gotten "theirs" in the form of six- and seven-figure compensation packages of which most working Americans can only dream.  But apparently that was not enough for some.
>
> Instead, ***shareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called "back-dating"*** – to further enrich themselves.  And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves.

14.     By this action, plaintiffs seek to remedy the substantial damage and injuries inflicted upon NVIDIA by defendants' secret backdating scheme.  By approving backdated grants to NVIDIA's executives and employees, the NVIDIA Board of Directors: (i) diverted hundreds of millions of dollars of corporate assets to top NVIDIA insiders; (ii) caused NVIDIA to materially understate its compensation expenses and materially overstate its net income or materially understate its net loss, exposing NVIDIA to potential liability for violations of the securities laws; (iii) subjected NVIDIA to substantial investigative costs and massive potential liability from regulators, including the SEC and the Internal Revenue Service ("IRS"); (iv) damaged NVIDIA's credibility with shareholders and business partners alike; (v) subjected NVIDIA to more than $190.2 million in charges for stock option compensation expense, and possible payments of back taxes, fines and

1  penalties as the IRS may impose; and (vi) exposed NVIDIA to possible delisting by the Nasdaq

2  stock market.

### JURISDICTION AND VENUE

4  15.  This Court has jurisdiction over this action pursuant to §§10(b) and 14(a) of the

5  Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78n(a), and Rule 10b-5,

6  17 C.F.R. §240.10b-5, promulgated thereunder.  Defendants, directly or indirectly, used the means

7  and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities

8  exchange in connection with the acts, transactions, practices and course of business alleged herein.

9  This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28

10  U.S.C. §1367.  This action is not a collusive one to confer jurisdiction on a court of the United States

11  which it would not otherwise have.

12  16.  Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C.

13  §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation

14  and dissemination of materially false and misleading information, occurred in substantial part in this

15  District.  NVIDIA is located in and conducts its business in this District.  Further, defendants

16  conduct business in this District, and certain of the defendants are citizens of California and reside in

17  this District.

### PARTIES

19  17.  Lead Plaintiff LIUNA Staff & Affiliates Pension Fund is a shareholder of NVIDIA

20  and has owned NVIDIA stock at all times relevant to this action.

21  18.  Lead Plaintiff Alaska Electrical Pension Fund is a shareholder of NVIDIA and has

22  owned NVIDIA stock at all times relevant to this action.

23  19.  Nominal defendant NVIDIA is a Delaware corporation with its principal executive

24  offices located at 2701 San Tomas Expressway, Santa Clara, California 95050.  NVIDIA is a leading

25  provider of programmable graphics processor technologies for use in computers, consumer

26  electronics and mobile devices.

27  20.  Defendant Jen-Hsun Huang ("Huang") co-founded NVIDIA in April 1993 and has

28  served as Chairman, President and Chief Executive Officer ("CEO") since that time.  As a member

1   of the Board of Directors and an executive of NVIDIA, Huang granted, received and/or concealed

2   the backdated stock options at issue in this case by making false statements in NVIDIA's proxy

3   statements and SEC reports that options grants made to executives were made at fair market value on

4   the date of grant when, in fact, they were not.  Defendant Huang assisted in the preparation of

5   NVIDIA's annual and quarterly reports issued since April 1993.  He also reviewed, approved and

6   helped to prepare each proxy statement NVIDIA issued since April 1993.  Defendant Huang signed

7   NVIDIA's financial reports for 2000-2003, as well as those for 2004-2006 which now must be

8   restated to correct the accounting irregularities caused by the secret backdating scheme.  Defendant

9   Huang received backdated options worth millions and therefore financially benefited from the

10  backdating scheme.  He also sold 5.3 million shares of NVIDIA stock for unlawful insider proceeds

11  of $99.4 million in violation of California Corporations Code §§25402 and 24502.5 and other

12  securities laws.

13          21.     Defendant Tench Coxe ("Coxe") has served as a Director of NVIDIA since June

14  1993.  As a member of the Board of Directors of NVIDIA and its Compensation Committee, Coxe

15  granted, received and/or concealed the backdated stock options at issue in this case by making false

16  statements in NVIDIA's proxy statements and SEC reports that options grants made to executives

17  were made at fair market value on the date of grant when, in fact, they were not.  Defendant Coxe

18  assisted in the preparation of NVIDIA's annual and quarterly reports issued since June 1993.  He

19  also reviewed, approved and helped to prepare each proxy statement NVIDIA issued since June

20  1993.  Defendant Coxe signed NVIDIA's financial reports for 2000-2003, as well as those for 2004-

21  2006 which now must be restated to correct the accounting irregularities caused by the secret

22  backdating scheme.  Defendant Coxe received backdated options worth millions and therefore

23  financially benefited from the backdating scheme.  He also sold 520,000 shares of NVIDIA stock for

24  unlawful insider trading proceeds of $12 million in violation of California Corporations Code

25  §§25402 and 24502.5.

26          22.     Defendant James C. Gaither ("Gaither") has served as a Director of NVIDIA since

27  December 1998.  As a member of the Board of Directors of NVIDIA and its Compensation

28  Committee, Gaither granted, received and/or concealed the backdated stock options at issue in this

1   case by making false statements in NVIDIA's proxy statements and SEC reports that options grants

2   made to executives were made at fair market value on the date of grant when, in fact, they were not.

3   Defendant Gaither assisted in the preparation of NVIDIA's annual and quarterly reports issued since

4   December 1998.  He also reviewed, approved and helped to prepare each proxy statement NVIDIA

5   issued since December 1998.  Defendant Gaither signed NVIDIA's financial reports for 1999-2003,

6   as well as those for 2004-2006 which now must be restated to correct the accounting irregularities

7   caused by the secret backdating scheme.  Defendant Gaither received backdated options worth

8   millions and therefore financially benefited from the backdating scheme.  He also sold 609,608

9   shares of NVIDIA stock for unlawful insider trading proceeds of $6.2 million in violation of

10  California Corporations Code §§25402 and 24502.5 and other securities laws.

11          23.     Defendant Harvey C. Jones, Jr. ("Jones") has served as a Director of NVIDIA since

12  November 1993.  As a member of the Board of Directors of NVIDIA and its Compensation

13  Committee, Jones granted, received and/or concealed the backdated stock options at issue in this

14  case by making false statements in NVIDIA's proxy statements and SEC reports that options grants

15  made to executives were made at fair market value on the date of grant when, in fact, they were not.

16  Defendant Jones assisted in the preparation of NVIDIA's annual and quarterly reports issued since

17  November 1993.  He also reviewed, approved and helped to prepare each proxy statement NVIDIA

18  issued since November 1993.  Defendant Jones signed NVIDIA's financial reports for 1999-2003, as

19  well as those for 2004-2006 which now must be restated to correct the accounting irregularities

20  caused by the secret backdating scheme.  Defendant Jones received backdated options worth

21  millions and therefore financially benefited from the backdating scheme.  He also sold 1.1 million

22  shares of NVIDIA stock for unlawful insider trading proceeds of $19.5 million in violation of

23  California Corporations Code §§25402 and 24502.5 and other securities laws.

24          24.     Defendant William J. Miller ("Miller") has served as a Director of the Company since

25  November 1994.  As a member of the Board of Directors of NVIDIA and its Audit Committee,

26  Miller granted, received and/or concealed the backdated stock options at issue in this case by making

27  false statements in NVIDIA's proxy statements and SEC reports that options grants made to

28  executives were made at fair market value on the date of grant when, in fact, they were not.

1   Defendant Miller assisted in the preparation of NVIDIA's annual and quarterly reports issued since

2   November 1994.  He also reviewed, approved and helped to prepare each proxy statement NVIDIA

3   issued since November 1994.  Defendant Miller signed NVIDIA's financial reports for 1999-2003,

4   as well as those for 2004-2006 which now must be restated to correct the accounting irregularities

5   caused by the secret backdating scheme.  Defendant Miller received backdated options worth

6   millions and therefore financially benefited from the backdating scheme.  He also sold 1.6 million

7   shares of NVIDIA stock for unlawful insider trading proceeds of $31.3 million in violation of

8   California Corporations Code §§25402 and 24502.5 and other securities laws.

9        25.     Defendant Mark L. Perry ("Perry") has served as a Director of the Company since

10  May 2005.  As a member of the Board of Directors of NVIDIA and its Audit Committee, Perry

11  concealed the backdated stock options at issue in this case by making false statements in NVIDIA's

12  proxy statements and SEC reports that options grants made to executives were made at fair market

13  value on the date of grant when, in fact, they were not.  Defendant Perry assisted in the preparation

14  of NVIDIA's annual and quarterly reports issued since May 2005.  He also reviewed, approved and

15  helped to prepare each proxy statement NVIDIA issued since May 2005.  Defendant Perry signed

16  NVIDIA's financial reports for 2006, which now must be restated to correct the accounting

17  irregularities caused by the secret backdating scheme.

18       26.     Defendant A. Brooke Seawell ("Seawell") has served as a Director of NVIDIA since

19  December 1997.  As a member of the Board of Directors of NVIDIA and its Audit Committee,

20  Seawall granted, received and/or concealed the backdated stock options at issue in this case by

21  making false statements in NVIDIA's proxy statements and SEC reports that options grants made to

22  executives were made at fair market value on the date of grant when, in fact, they were not.

23  Defendant Seawall assisted in the preparation of NVIDIA's annual and quarterly reports issued since

24  December 1997.  He also reviewed, approved and helped to prepare each proxy statement NVIDIA

25  issued since December 1997.  Defendant Seawall signed NVIDIA's financial reports for 1999-2003,

26  as well as those for 2004-2006 which now must be restated to correct the accounting irregularities

27  caused by the secret backdating scheme.  Defendant Seawall received backdated options worth

28  millions and therefore financially benefited from the backdating scheme.  He also sold 476,400

1   shares of NVIDIA stock for unlawful insider trading proceeds of $9.8 million in violation of

2   California Corporations Code §§25402 and 24502.5 and other securities laws.

3          27.     Defendant Steven Chu ("Chu") has served as a Director of NVIDIA since July 2004.

4   As a member of the Board of Directors of NVIDIA, Chu granted, received and/or concealed the

5   backdated stock options at issue in this case by making false statements in NVIDIA's proxy

6   statements and SEC reports that options grants made to executives were made at fair market value on

7   the date of grant when, in fact, they were not.  Defendant Chu assisted in the preparation of

8   NVIDIA's annual and quarterly reports issued since July 2004.  He also reviewed, approved and

9   helped to prepare each proxy statement NVIDIA issued since July 2004.  Defendant Chu signed

10  NVIDIA's financial reports for 2005-2006 which now must be restated to correct the accounting

11  irregularities caused by the secret backdating scheme.

12         28.     Defendant Mark A. Stevens ("Stevens") served as a Director of NVIDIA from 1993

13  until June 2006.  As a member of the Board of Directors of NVIDIA and its Audit Committee,

14  Stevens granted, received and/or concealed the backdated stock options at issue in this case by

15  making false statements in NVIDIA's proxy statements and SEC reports that options grants made to

16  executives were made at fair market value on the date of grant when, in fact, they were not.

17  Defendant Stevens assisted in the preparation of NVIDIA's annual and quarterly reports issued

18  between 1993-June 2006.  He also reviewed, approved and helped to prepare each proxy statement

19  NVIDIA issued between 1993-June 2006.  Defendant Stevens signed NVIDIA's financial reports for

20  2000-2003, as well as those for 2004-2005 which now must be restated to correct the accounting

21  irregularities caused by the secret backdating scheme.  Defendant Stevens received backdated

22  options worth millions and therefore financially benefited from the backdating scheme.  He also sold

23  2.4 million shares of NVIDIA stock for unlawful insider trading proceeds of $23.4 million in

24  violation of California Corporations Code §§25402 and 24502.5 and other securities laws.

25         29.     Defendant Christine B. Hoberg ("Hoberg") previously served as NVIDIA's Chief

26  Financial Officer ("CFO") from December 1998 until July 2002.  As an executive of NVIDIA,

27  Hoberg received and/or concealed the backdated stock options at issue in this case by making false

28  statements in NVIDIA's proxy statements and SEC reports that options grants made to executives

1   were made at fair market value on the date of grant when, in fact, they were not. Defendant Hoberg

2   assisted in the preparation of NVIDIA's annual and quarterly reports issued between December

3   1998-July 2002. She also reviewed, approved and helped to prepare each proxy statement NVIDIA

4   issued since between December 1998-July 2002. Defendant Hoberg signed NVIDIA's financial

5   reports for 1999-2001 which now must be restated to correct the accounting irregularities caused by

6   the secret backdating scheme. Defendant Hoberg received backdated options worth millions and

7   therefore financially benefited from the backdating scheme. She also sold 1.4 million shares of

8   NVIDIA stock for unlawful insider trading proceeds of $18.8 million in violation of California

9   Corporations Code §§25402 and 24502.5 and other securities laws.

10          30.     Defendant Mary Dotz ("Dotz") previously served as NVIDIA's CFO on an interim

11  basis from April 2002 until September 2002. As an executive of NVIDIA, Dotz received and/or

12  concealed the backdated stock options at issue in this case by making false statements in NVIDIA's

13  proxy statements and SEC reports that options grants made to executives were made at fair market

14  value on the date of grant when, in fact, they were not. Defendant Dotz assisted in the preparation of

15  NVIDIA's annual and quarterly reports issued between April 2002-September 2002. She also

16  reviewed, approved and helped to prepare each proxy statement NVIDIA issued between April

17  2002-September 2002. Defendant Dotz helped prepare NVIDIA's financial reports which now must

18  be restated to correct the accounting irregularities caused by the secret backdating scheme.

19  Defendant Dotz received backdated options worth millions and therefore financially benefited from

20  the backdating scheme.

21          31.     Defendant Marvin D. Burkett ("Burkett") has served as the Company's CFO since

22  September 2002. As an executive of NVIDIA, Burkett received and/or concealed the backdated

23  stock options at issue in this case by making false statements in NVIDIA's proxy statements and

24  SEC reports that options grants made to executives were made at fair market value on the date of

25  grant when, in fact, they were not. Defendant Burkett assisted in the preparation of NVIDIA's

26  annual and quarterly reports issued since September 2002. He also reviewed, approved and helped

27  to prepare each proxy statement NVIDIA issued since September 2002. Defendant Burkett helped

28  prepare NVIDIA's financial reports for 2002-2003, as well as those for 2004-2006 which now must

1    be restated to correct the accounting irregularities caused by the secret backdating scheme.

2    Defendant Burkett received backdated options worth millions and therefore financially benefited

3    from the backdating scheme.

4         32.    Defendant Jeffrey D. Fisher ("Fisher") joined NVIDIA in July 1994 and currently

5    serves as the Company's Senior Vice President, GPU Business Unit.  As an executive of NVIDIA,

6    Fisher received and/or concealed the backdated stock options at issue in this case by making false

7    statements in NVIDIA's proxy statements and SEC reports that options grants made to executives

8    were made at fair market value on the date of grant when, in fact, they were not.  Defendant Fisher

9    assisted in the preparation of NVIDIA's annual and quarterly reports issued since July 1994.  He also

10   reviewed, approved and helped to prepare each proxy statement NVIDIA issued since July 1994.

11   Defendant Fisher helped prepare NVIDIA's financial reports for 1999-2003, as well as those for

12   2004-2006 which now must be restated to correct the accounting irregularities caused by the secret

13   backdating scheme.  Defendant Fischer received backdated options worth millions and therefore

14   financially benefited from the backdating scheme.  He also sold 3 million shares of NVIDIA stock

15   for unlawful insider trading proceeds of $45 million in violation of California Corporations Code

16   §§25402 and 24502.5 and other securities laws.

17        33.    Defendant Chris A. Malachowsky ("Malachowsky") co-founded NVIDIA in April

18   1993 and currently serves as the Company's Senior Vice President, Engineering and Operations.  As

19   an executive of NVIDIA, Malachowsky granted, received and/or concealed the backdated stock

20   options at issue in this case by making false statements in NVIDIA's proxy statements and SEC

21   reports that options grants made to executives were made at fair market value on the date of grant

22   when, in fact, they were not.  Defendant Malachowsky assisted in the preparation of NVIDIA's

23   annual and quarterly reports issued since April 1993.  He also reviewed, approved and helped to

24   prepare each proxy statement NVIDIA issued since April 1993.  Defendant Malachowsky helped

25   prepare NVIDIA's financial reports for 1999-2003, as well as those for 2004-2006 which now must

26   be restated to correct the accounting irregularities caused by the secret backdating scheme.

27   Defendant Malachowsky received backdated options worth millions and therefore financially

28   benefited from the backdating scheme.  He also sold 5.2 million shares of NVIDIA stock for

1   unlawful insider trading proceeds of $63 million in violation of California Corporations Code

2   §§25402 and 24502.5 and other securities laws.

3          34.   Defendant Daniel F. Vivoli ("Vivoli") joined NVIDIA as Vice President of Product

4   Marketing in 1997 and currently serves as the Company's Senior Vice President of Marketing.  As

5   an executive of NVIDIA, Vivoli received and/or concealed the backdated stock options at issue in

6   this case by making false statements in NVIDIA's proxy statements and SEC reports that options

7   grants made to executives were made at fair market value on the date of grant when, in fact, they

8   were not.  Defendant Vivoli assisted in the preparation of NVIDIA's annual and quarterly reports

9   issued since 1997.  He also reviewed, approved and helped to prepare each proxy statement NVIDIA

10  issued since 1997.  Defendant Vivoli helped prepare NVIDIA's financial reports for 1999-2003, as

11  well as those for 2004-2006 which now must be restated to correct the accounting irregularities

12  caused by the secret backdating scheme.  Defendant Vivoli received backdated options worth

13  millions and therefore financially benefited from the backdating scheme.  He also sold 475,256

14  shares of NVIDIA stock for unlawful insider trading proceeds of $6.1 million in violation of

15  California Corporations Code §§25402 and 24502.5 and other securities laws.

16         35.   Defendant David M. Shannon ("Shannon") has served as NVIDIA's General Counsel

17  since August 2002.  As an executive of NVIDIA, Shannon received and/or concealed the backdated

18  stock options at issue in this case by making false statements in NVIDIA's proxy statements and

19  SEC reports that options grants made to executives were made at fair market value on the date of

20  grant when, in fact, they were not.  Defendant Shannon assisted in the preparation of NVIDIA's

21  annual and quarterly reports issued since August 2002.  He also reviewed, approved and helped to

22  prepare each proxy statement NVIDIA issued since August 2002.  Defendant Shannon helped

23  prepare NVIDIA's financial reports for 2002-2003, as well as those for 2004-2006 which now must

24  be restated to correct the accounting irregularities caused by the secret backdating scheme.

25  Defendant Shannon received backdated options worth millions and therefore financially benefited

26  from the backdating scheme.

27         36.   Defendant Curtis R. Priem ("Priem") co-founded NVIDIA in April 1993 and

28  previously served as the Company's Chief Technical Officer until 2003.  As a co-founder and

1   executive of NVIDIA, Priem granted, received and/or concealed the backdated stock options at issue

2   in this case by making false statements in NVIDIA's proxy statements and SEC reports that options

3   grants made to executives were made at fair market value on the date of grant when, in fact, they

4   were not.  Defendant Priem assisted in the preparation of NVIDIA's annual and quarterly reports

5   issued between April 1993 and 2003.  He also reviewed, approved and helped to prepare each proxy

6   statement NVIDIA issued between April 1993 and 2003.  Defendant Priem helped prepare

7   NVIDIA's financial reports for 1999-2003, which now must be restated to correct the accounting

8   irregularities caused by the secret backdating scheme.  Defendant Priem received backdated options

9   worth millions and therefore financially benefited from the backdating scheme.  He also sold

10  600,000 shares of NVIDIA stock for unlawful insider trading proceeds of $3.9 million in violation of

11  California Corporations Code §§25402 and 24502.5 and other securities laws.

12  **THE FIDUCIARY DUTIES OF NVIDIA'S DIRECTORS AND OFFICERS**

13      37.    As NVIDIA's directors and officers, defendants owed NVIDIA fiduciary duties,

14  including duties of good faith, fair dealing, honesty and loyalty, in the performance of their

15  responsibilities with respect to the management and administration of the affairs of NVIDIA, as well

16  as the duty of full and candid disclosure of all material facts related thereto.

17      38.    In addition, defendants owed to NVIDIA the duty to ensure that its shareholder

18  reports about the Company and its business and finances were accurate, complete and truthful and

19  not in any way false and/or materially misleading.  The conduct of NVIDIA's executives who

20  engaged in unlawful insider trading in violation of the securities laws, as well as their fiduciary

21  duties of good faith and loyalty, has been ratified by NVIDIA's Board of Directors, which failed to

22  take action against them.

23      39.    To discharge their duties, defendants were required to exercise good faith and

24  reasonable diligence in the supervision of NVIDIA's business and financial affairs.  By virtue of

25  these obligations, defendants were required, among other things:

26          (a)    to manage, conduct, supervise, and direct the business and affairs of NVIDIA

27  in good faith in accordance with state and federal laws and regulations and the Articles of

28  Incorporation and By-Laws of NVIDIA;

1           (b)      to exercise reasonable control and supervision over the officers and employees

2 of NVIDIA;

3           (c)      to exercise good faith in evaluation of the prudence and soundness of policies

4 and practices proposed to be undertaken by NVIDIA;

5           (d)      to ensure that NVIDIA did not engage in unsafe, imprudent, or unsound

6 practices and that NVIDIA complied with all applicable laws and regulations;

7           (e)      to establish guidelines and policies adequately governing the structure and

8 organization of the Company's operations;

9           (f)      to establish guidelines and policies adequately governing NVIDIA's stock

10 option accounting and stock option granting practices;

11           (g)      to maintain a proper division of authority and responsibility among the

12 officers and directors of NVIDIA so as to prevent the dominance of any officer or director in the

13 conduct of the business and affairs of NVIDIA;

14           (h)      to ensure that NVIDIA did not engage in unsafe, imprudent, or unsound

15 practices and to become and remain informed as to how NVIDIA was, in fact, operating;

16           (i)      to maintain and implement an adequate and functioning system of internal

17 financial and accounting controls, such that NVIDIA's assets would be safeguarded, its financial

18 statements and information would be accurately recorded and reported, and corporate managers

19 would be given prompt notice of serious problems or divergences so that risk to the corporation

20 would be minimized; and

21           (j)      to supervise the preparation and filing of financial results and financial

22 statements required by law from NVIDIA, including the Company's SEC reports, and to examine

23 and evaluate any reports of examination, audits or other information required by law concerning the

24 financial condition of NVIDIA and to make full and accurate disclosure of all material facts

25 concerning, among other things, each of the subjects and duties set forth above.

26       40.     At all relevant times, defendants occupied positions with NVIDIA or were associated

27 with the Company in such a manner as to make them privy to confidential proprietary information

28 concerning NVIDIA's business and finances, as well its accounting and stock option granting

1    practices, and present and future business prospects.  Because of these positions and such access,

2    each of these defendants knew or recklessly disregarded that the adverse facts specified herein had

3    not been disclosed to and were being concealed from the public.

4                          **BACKGROUND OF STOCK OPTIONS**

5    **The Purpose of Stock Options**

6          41.     The purpose of a stock option granted by a corporation to an officer, director,

7    employee or other person allows the option holder to purchase the corporation's stock at a specified

8    price – referred to as the "exercise price" – for a specified period of time.  Under most stock option

9    plans, the exercise price of the option is based on the price of the stock as of the grant date, which

10   could be the closing price of the stock on that date, an average of the high and low of the prices on

11   that date, or other valuation method.  When the holder of a stock option exercises such an option, he

12   or she purchases the stock from the company at the exercise price – regardless of the stock's market

13   price at the time the option is exercised.  Under most plans, the employees or option recipient cannot

14   exercise the options until a vesting period has passed.  Options with a strike price equal to the current

15   trading price of the underlying stock are referred to as being "at the money" and options with a strike

16   price below the current trading price of the stock are "in the money."

17          42.     Companies typically grant stock options to their executives and directors as equity-

18   based compensation, which is intended to create incentives to boost profitability and increase the

19   overall value of the enterprise.  Thus, stock options are intended to align the interests of company

20   management with those of shareholders.  With a significant option package, members of company

21   management have a great incentive to improve the company's business; such efforts tend to raise the

22   company's share price, which increases both the value of his or her options and shareholder returns.

23          43.     There are several reasons why stock options have been increasingly included in the

24   compensation packages of executives and non-executives.  According to SEC Chairman Christopher

25   Cox, beginning in 1972, the accounting rule was that employee stock options would not have to be

1   shown as an expense on the income statements – so long as the terms were fixed when the option

2   was granted, and so long as the exercise price was equal to the market price on that day.

3        44.    Further, as indicated by Linda Thomsen, Director of the SEC's Division of

4   Enforcement, options became more popular after Section 162(m) of the Internal Revenue Code

5   ("Section 162(m)") went into effect in 1993, which limited the tax deductibility of compensation

6   awarded to certain top executives to $1 million.  This change in the tax law tilted compensation

7   practices away from salary and other forms of compensation in favor of performance-based

8   compensation to which the cap did not apply, such as stock options.  Unfortunately, as the use of

9

10  options compensation has increased, so has the abusive practice of backdating.

11  **Backdating of Stock Options**

12       45.    The improper practice of "backdating" stock options occurs when one or more

13  individuals within a company retroactively sets the exercise price for a stock option based on a date

14  other than the grant date of the option.  Significant accounting, disclosure and tax consequences

15  resulting from grants of "in the money" options provide an incentive for corporate executives to

16  covertly backdate these options.  If an option is backdated to a day on which the stock's market price

17  was lower than the price on the day the option was granted, the holder pays less and the company

18  receives less money for the stock when the option is exercised.  This arrangement gives the

19

20  executive or director greater compensation than that to which he or she is entitled, and undermines

21  the incentive value of the option grant.

22

23       46.    As a result, as indicated in the testimony of United States Deputy Attorney General

24  Paul McNulty before the Senate Committee on Finance, "some corporate executives have engaged in

25  schemes to falsify corporate books and records, to mislead the corporation's board of directors and

26  outside auditors, to file false reports and financial statements with the Securities and Exchange

27  Commission (SEC), and to mislead shareholders, the investing public and the financial press."

28

47.     On a fundamental level, backdated options allow company executives and directors to prosper without building long-term shareholder value.  By giving them an instant paper profit, backdating undermines the purpose of options – which is to motivate those who lead the company to act in ways that improve the business and consequently lift the stock price.  Indeed, backdating is a lot like betting on a poker hand after all the cards are displayed.

48.     The practice of backdating stock options can result in significant adverse tax consequences for the company.  Under Section 162(m), at-the-money options are usually considered performance-based compensation (typically granted to the five highest-paid executives) that is deductible from corporate tax returns even if an executive earns more than $1 million a year.  If it turned out that these performance-based options were actually in-the-money options, however, it would automatically disqualify such options from receiving the tax break.  Instead, a company's tax deduction would be capped at $1 million for each of the five highest-paid executives.  In effect, the problem with backdating is that it allows in-the-money options to appear in regulatory filings as if they were ordinary at-the-money grants.  Ultimately, if it turns out that the exercise price of an option has to be corrected or if a previously-issued option is disallowed altogether, any tax benefits from employee stock option exercises the company may have received must either be adjusted or eliminated, with the company suffering, of course, from the interest and penalties assessed or to be assessed by the IRS relative to the backdating.

49.     Other implications are seen in the context of the two common forms of employee options – non-statutory stock options, or "NSOs," and incentive stock options, or "ISOs," as indicated in the testimony of Linda Thomsen, Director of the SEC's Division of Enforcement before the U.S. Senate Committee on Finance, on September 6, 2006:

> When an employee exercises a non-statutory option, the difference between the exercise price and the fair market value of the company's stock on the date of exercise is treated as ordinary compensation and the employee is generally taxed on the gain at his or her ordinary income tax rates.  The company incurs employee

withholding obligations on this gain, but also is entitled to an associated tax deduction on the gain. When companies backdate option grants to a lower exercise price, employees can obtain a larger taxable gain upon the exercise of an NSO and companies can obtain a correspondingly larger tax deduction and withholding obligation on that gain.

Unlike the exercise of NSOs, incentive stock options, or ISOs, afford employees favorable tax treatment because any gain at exercise is not taxed as ordinary income, although the gain may be subject to alternative minimum tax. Accordingly, a company does not obtain any corresponding tax deduction (or incur withholding obligations) at the time of exercise. In addition, if an employee holds the stock for the statutory holding period prior to sale – one year after exercise and two years after grant – then the sale is considered a "qualifying disposition" and the entire gain on sale is taxed at favorable capital gains rates. However, among the statutory requirements of ISOs is that they be granted at-the-money. An ISO that is granted in-the-money loses its favorable status and instead is treated under the tax code as a non-statutory option (NSO), including ordinary income recognition by the employee on any gain at exercise and a corresponding tax deduction by the company on that gain. Backdating allows an employee to treat what is in fact a non-qualified option as an incentive stock option, which can result in the employee underpaying taxes while causing the company to lose the tax deduction to which it otherwise would have been entitled.

50.     The instant paper profit received by certain NVIDIA executives and directors through the use of backdated stock options raises serious accounting issues. Under Generally Accepted Accounting Principles ("GAAP"), this instant paper profit was equivalent to extra compensation and should have been reflected as a cost to NVIDIA in the Company's financial statements. But as NVIDIA failed to properly record the costs associated with the extra compensation in its financial statements, its profits were overstated during the fiscal periods in which the options were granted.

**Criminal Nature of Backdating Misconduct**

51.     As noted in Deputy Attorney General McNulty's testimony before the Senate Finance Committee:

When stock options are surreptitiously backdated, the corporation will file false and misleading reports and financial statements with the SEC and other regulatory authorities. By doing that, the corporation disseminates false and fraudulent information to the investing public. Failing to report the backdating of options misrepresents the true nature of stock option plans and executive compensation and thus, a company obtains shareholder approval for the company's compensation plans under false pretenses. Grants of backdated options contrary to the terms of shareholder-approved option compensation plans can also be considered an embezzlement of corporate assets because the defendants are misappropriating shares of the company at an unauthorized and discounted value.

52.     These acts can be criminal for several reasons as noted by Deputy Attorney General McNulty:

> First, a grant of "in the money" options is treated under accounting principles as compensation to the option holder, and therefore should be treated as an expense by the corporation and be deducted from reported revenue.  In contrast, grants of options with an exercise price either above or at the trading price on the real grant date are not considered an expense of the corporation.  Thus, if a corporation both backdates options and prices them "in the money" without properly disclosing this fact, the corporation is falsifying its books and records, fraudulently decreasing expenses and falsely inflating profits.  Second, backdating of stock options also conceals the fact that employees are being given the right to purchase the underlying stock at a discount from the fair market value on the date the option was really granted – and that misrepresents the employee's compensation.  Finally, the sale of the underlying stock to these favored employees at a discount to the market price dilutes the value of the shares held by stockholders.

53.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock option grant dates.  Criminal indictments were brought simultaneously in federal court, indicating the serious view taken by governmental agencies with respect to improperly backdated options.  In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "***the full weight of the Federal government is being put behind this effort to stamp out fraudulent stock option backdating***."  He disclosed that additional cases likely would he brought in the "coming weeks and months."  Cox further indicated that the SEC was then investigating more than 80 companies, a large percentage of which are technology companies, meaning many more executives could face criminal charges related to manipulating options.

54.     Indeed, on July 31, 2006, the Federal Bureau of Investigation ("FBI") issued an arrest warrant for Jacob "Kobi" Alexander ("Alexander"), the former CEO of Comverse Technology, Inc.  Alexander is charged with conspiracy related to backdated stock options.  Not surprisingly, on August 9, 2006, he and fellow company cohorts David Kreinberg ("Kreinberg") (Comverse's former CFO) and William F. Sorin (Comverse's former General Counsel) were criminally charged by the U.S. Attorney's Office in the Eastern District of New York for allegedly orchestrating a decade-old

1   scheme to fraudulently backdate option grants and for operating a secret stock options slush fund.

2   After transferring more than $57 million from the United States to accounts in the Middle East,

3   Alexander fled the country.  Emphasizing the importance that the U.S. government has placed on

4   dealing with the backdating options scandal, Alexander was placed on the FBI's most wanted list.

5   On September 27, 2006, after an international manhunt, Alexander was captured in Namibia, and is

6   expected to be extradited to the United States to stand trial.  On October 24, 2006, less than three

7   months after being charged, it was announced that Kreinberg had pleaded guilty to securities-fraud

8   charges related to stock options backdating in federal court.

9

10      55.     This resolve of the government is being felt not only through the federal grand jury

11  indictments and acceptance of guilty pleas in federal court, as well as the concerted action of the

12  Justice Department and the SEC, but also through statements of leading legislative figures such as

13  those of Senator Chuck Grassley in regards to stock options backdating:

14

15          It is important that we defend the American principles of capitalism and free
        market innovation, and it is also important that we defend the equally important
16      American principles of fairness and the rule of law.  These are not conflicting
        principles.  They are the backbone of our nation.  ***And those who violate them need***
17      ***to answer for that***.

18                              **FACTUAL ALLEGATIONS**

19      56.     During the late 1990s and 2000s, NVIDIA enjoyed steady growth in both sales and

20  the size of its operations.  To recruit and retain directors, officers and key employees, NVIDIA, at

21  the direction of its Board of Directors, made liberal use of stock options as a form of compensation.

22      57.     Each option gave the recipient the right to buy one share of NVIDIA common stock

23  from the Company at a set price, called the "exercise" or "strike" price, on a future date after the

24  option vested.  The option was "in-the-money" whenever the trading price of NVIDIA common

25  stock exceeded the option's exercise price.  The option was "at-the-money" whenever the trading

26  price of NVIDIA common stock and the exercise price were the same.  The option was "out-of-the-

27  money" or "underwater" whenever the trading price of NVIDIA common stock was less than the

28  exercise price.

58.     Throughout the relevant period, defendants represented that NVIDIA's option grants were made at fair market value, *i.e.*, the closing price of NVIDIA common stock on the date of grant. The Board of Directors has no discretion to contravene the terms of the stock option plans.  Altering the actual date of grant so as to affect the exercise price, as defendants did, contravenes the plans.

**The NVIDIA Stock Option Plans**

59.     At all relevant times, NVIDIA granted stock options pursuant to the 1998 Equity Incentive Plan and the 1998 Non-Employee Directors' Stock Option Plan.

60.     According to NVIDIA's public disclosures, options are granted at fair market value on the date of grant.  The NVIDIA Board of Directors also represented that stock options will only have value if the Company's stock price increases, and not by virtue of the backdating of such options.

**NVIDIA's By-Laws**

61.     At all relevant times, the By-Laws of NVIDIA authorized the Board of Directors and/or Compensation Committee to act formally on option grant proposals in one of two ways:  The Board of Directors and/or Compensation Committee could act without a formal meeting if all members of the Board or Committee consented in writing to the adoption of a resolution authorizing the action.  This is "unanimous written consent."  Alternatively, the Board of Directors and/or Compensation Committee could act by holding a meeting at which a quorum of the Board or Committee members is present, if a majority of those present at the meeting approve the action.

62.     For some of the NVIDIA option grants made during the relevant period, the Board of Directors and/or Compensation Committee acted through unanimous written consents, and not through a formal meeting of the Board of Directors or Compensation Committee members.

**Backdated Stock Option Grants at NVIDIA**

63.     A review of the annual stock option grants to directors and top officers of NVIDIA between 1999-2002 shows that the stock option grants were dated: (i) near or on the very day that NVIDIA stock hit its low price for the month; or (ii) in advance of sharp stock price increases.  This astonishing multi-year pattern of stock option grants on dates with highly favorable exercise prices – at or near a periodic low, or preceding a sharp increase in the share price – indicates that the

purported grant dates of stock options were not the actual dates on which the option grants were made.   Rather, the pattern indicates that the grants were repeatedly backdated to dates with exceedingly low stock prices or, at the least, granted when NVIDIA's officers and directors knew at the time that those options would quickly be worth much more – a practice referred to as "spring loading" of options.  As the court determined in *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-N, 2007 Del. Ch. LEXIS 19, at *62 (Del. Ch. Feb. 6, 2007):

> It is difficult to conceive of an instance, consistent with the concept of loyalty and good faith, in which a fiduciary may declare than an option is granted at "market rate" and simultaneously withhold that both the fiduciary and the recipient ***knew*** at the time that those options would quickly be worth much more.

**1999 Stock Option Grants**[1]

64.     During 1999, the public trading price of NVIDIA common stock ranged from a price of $1.50 to $2.72 per share, with a weighted average closing price of $2.45.  A total of 1,100,000 options were purportedly granted on June 18, 1999 to six NVIDIA directors.  The exercise price was $2.05 per share.  The price of the stock 20 trading days after the grant was $2.67 per share, for a 20-day cumulative return based on the exercise price of 30.53%.  The exercise price was one of the lowest closing prices for the month of June 1999.  A graph demonstrating the timing of this grant follows below:

---

[1]      All exercise prices, number of options and stock prices are adjusted for splits.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Nvidia Corporation**
**May 18, 1999 - July 19, 1999**

[Graph: Dollars Per Share vs Date, from 05/18/1999 to 07/19/1999, with annotation "6/18/1999"]

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|---|---|---|---|---|---|
| 06/18/99 | Jones | 200,000 | $2.05 | $409,375 | $66,798 |
| 06/18/99 | Coxe | 200,000 | $2.05 | $409,375 | $66,798 |
| 06/18/99 | Miller | 160,000 | $2.05 | $327,500 | $53,438 |
| 06/18/99 | Seawell | 200,000 | $2.05 | $409,375 | $66,798 |
| 06/18/99 | Stevens | 200,000 | $2.05 | $409,375 | $66,798 |
| 06/18/99 | Gaither | 40,000 | $2.05 | $81,875 | $13,360 |

65.    A total of 168,000 options were purportedly granted on October 29, 1999 to defendant Fischer. The exercise price was $2.56 per share. The price of the stock 20 trading days after the grant was $4.75 per share, for a 20-day cumulative return based on the exercise price of 86.59%. The exercise price was the lowest closing price for the month of October 1999. A graph demonstrating the timing of this grant follows below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 10/29/99 | Fischer | 168,000 | $2.56 | $430,500 | $803,258 |

20    66.    A total of 240,000 options were purportedly granted on November 1, 1999 to two

21  NVIDIA executives.  The exercise price was $2.94 per share.  The price of the stock 20 trading days

22  after the grant was $4.33 per share, for a 20-day cumulative return based on the exercise price of

23  47.34%.  The exercise price was the lowest closing price for the month of November 1999.  A graph

24  demonstrating the timing of this grant follows below:

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



**Nvidia Corporation**
September 29, 1999 - December 1, 1999

18
19
20

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant ) | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|--------------------------------------|-----------------------------------------------|
| 11/01/99 | TBD | 120,000 | $2.94 | $352,500 | 519,372 |
| 11/01/99 | TBD | 120,000 | $2.94 | $352,500 | 519,372 |

21   67.   A total of 3,200,000 options were purportedly granted on January 31, 2000 to

22   NVIDIA's President and CEO, defendant Huang.  The exercise price was $4.63 per share.  The price

23   of the stock 20 trading days after the grant was $8.00 per share, for a 20-day cumulative return based

24   on the exercise price of 72.68%.  The exercise price was the lowest closing price for the month of

25   January 2000.  A graph demonstrating the timing of this grant follows below:

26
27
28

CONSOLIDATED VERIFIED SHAREHOLDERS DERIVATIVE  COMPLAINT - C-06-06110-SBA      - 26 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|---|---|---|---|---|---|
| 01/31/00 | Huang | 3,200,000 | $4.63 | $14,824,000 | $25,600,000 |

**2000 Stock Option Grants**

68.     During 2000, the public trading price of NVIDIA common stock ranged from a price of $2.05 to $5.87 per share, with a weighted average closing price of $3.42.  A total of 555,192 options were purportedly granted on July 28, 2000 to an NVIDIA executive.  A total of 30,000 options were purportedly granted on October 19, 2000, to two NVIDIA executives.  The exercise price was $14.52 per share.  The price of the stock 20 trading days after the grant was $17.24 per share, for a 20-day cumulative return based on the exercise price of 18.76%.  The exercise price was

the lowest closing price for the month of October 2000  A graph demonstrating the timing of this grant follows below:

**Nvidia Corporation**
September 27, 2000 - November 7, 2000



| Date | Executive | No. of Options Granted) | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------|---------|---------|---------|
| 10/19/00 | Fischer | 15,000 | $14.52 | $870,900 | $1,034,298 |
| 10/19/00 | Malachowsky | 15,000 | $14.52 | $870,900 | $1,034,298 |

69.    A total of 720,000 options were purportedly granted on January 3, 2001, to four NVIDIA executives. The exercise price was $7.49 per share. The price of the stock 20 trading days after the grant was $12.91 per share, for a 20-day cumulative return based on the exercise price of 72.44%. The exercise price was the lowest closing price for the month of January 2001. A graph demonstrating the timing of this grant follows below:

CONSOLIDATED VERIFIED SHAREHOLDERS DERIVATIVE  COMPLAINT - C-06-06110-SBA        - 28 -



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Nvidia Corporation**
December 1, 2000 - February 5, 2001

*(Line chart titled "Nvidia Corporation, December 1, 2000 - February 5, 2001" with y-axis "Dollars Per Share" ranging from $6 to $14, and x-axis dates from 12/01/2000 to 02/02/2001. An arrow labeled "1/3/2001" points to a low point on the chart near $10.)*

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 01/03/01 | Fischer | 200,000 | $7.49 | $1,497,000 | $2,581,260 |
| 01/03/01 | Hoberg | 200,000 | $7.49 | $1,497,000 | $2,581,260 |
| 01/03/01 | Malachowsky | 200,000 | $7.49 | $1,497,000 | $2,581,260 |
| 01/03/01 | Priem | 120,000 | $7.49 | $898,200 | $1,548,756 |

**2001 Stock Option Grant**

70.      During 2001, the public trading price of NVIDIA common stock ranged from a price

of $4.74 to $21.62 per share, with a weighted average closing price of $13.43.  A total of 1,620,000

options were purportedly granted on July 26, 2001 to four NVIDIA executives, including its

President and CEO, defendant Huang.  The exercise price was $17.92 per share.  The price of the

stock 20 trading days after the grant was $21.20 per share, for a 20-day cumulative return based on

the exercise price of 18.27%.  The exercise price was one of the lowest closing prices for the month of July 2001.  A graph demonstrating the timing of this grant follows below:



**Nvidia Corporation**
June 26, 2001 - August 27, 2001

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date of Grant | Total Grant Value 20 Trading Days After Grant |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------------------------|
| 07/26/01 | Huang | 1,000,000 | $17.92 | $17,922,500 | $21,197,500 |
| 07/26/01 | Fischer | 140,000 | $17.92 | $2,509,150 | $2,967,650 |
| 07/26/01 | Hoberg | 240,000 | $17.92 | $4,301,400 | $5,087,400 |
| 07/26/01 | Malachowsky | 240,000 | $17.92 | $4,301,400 | $5,087,400 |

71.    Overall, between 1999-2001, there were numerous backdated option grants at NVIDIA.  Backdated, in-the-money options were granted during that period to NVIDIA top executives and a majority of members of the Board of Directors, *i.e.*, Coxe, Gaither, Jones, Miller, Seawell, and Stevens.  All of the grants made by and/or to defendants during the relevant period were granted at or near the lowest closing price for the month and/or fiscal quarter.  Because the

1    odds of such an occurrence happening randomly are so remote, the only likely explanation for this

2    pattern was that their stock options had been back- or misdated.

3          72.     Equally indicative of defendants' stock option manipulation is the fact that before the

4    passage of the Sarbanes-Oxley Act of 2002, several option grants to NVIDIA executives came at

5    monthly lows in NVIDIA share prices.  However, following the passage of the Sarbanes-Oxley Act

6    of 2002, this trend reversed.  Between August 2002 and the present, only one of the option grants to

7    NVIDIA executives came at a monthly low.  This precipitous decline in the number of well-timed

8    stock option grants received by NVIDIA directors, officers and employees further demonstrates the

9    suspicious timing of defendants' stock option grants.

10         73.     Backdating the date of issuance of the executive stock options violated NVIDIA's

11    stock option plans, which provided that the exercise price of options to purchase NVIDIA common

12    stock shall not be less than 100% of the fair market value on the date of grant.  It also is directly

13    contradicted by the public disclosures in NVIDIA's proxy statements and SEC Reports on Form 10-

14    K which defendants signed at various times.  The secret practice of backdating stock option grants to

15    themselves and their colleagues was in breach of defendants' fiduciary duties, including their duties

16    of good faith, honesty and loyalty, owed to NVIDIA and its shareholders.

17         74.     The backdating scheme, among other things, enabled defendants to disguise the fact

18    that the Company was paying higher compensation to directors, executives and employees by

19    awarding them in-the-money options and to avoid having to expense the in-the-money portion as

20    compensation expense and thus avoid reductions in the Company's net income and earnings.

21    Keeping the scheme secret also hid the injury to the Company which occurred when directors,

22    executives and employees exercised the options and made capital contributions to NVIDIA that were

23    less than they should have paid, had the options not been granted in-the-money.

24         75.     The scheme also conferred great personal financial benefits on NVIDIA's directors

25    and officers.  For example, NVIDIA directors Coxe, Seawell, Stevens, Jones, Miller and Gaither

26    were awarded 200,000, 200,000, 200,000, 200,000, 160,000, and 40,000, respectively.  Likewise,

27    NVIDIA officers Huang, Fischer, Malachowsky, Hoberg and Priem were awarded 4,300,000,

28    523,000, 455,000, 440,000 and 120,000 options, respectively.  Contrary to the express terms of

1    NVIDIA's stock option plans, all of these options were manipulated and carried an exercise price

2    below fair market value at the time of grant.  Defendants have enjoyed huge profits on their exercise

3    of options and sales of the underlying shares, and collectively continue to hold backdated options

4    worth millions of dollars.

5    **False Proxy Statements**

6            76.    From 1999 to 2006, defendants, with the knowledge and approval and participation of

7    one another, and for the sole purpose and with the effect of concealing the manipulation of stock

8    option grants, as alleged herein, disseminated to shareholders and filed with the SEC the following

9    annual proxy statements that contained material misrepresentations and omissions.

10           77.    The  material  misrepresentations  and  omissions  in  NVIDIA's  1999-2006  proxy

11   statements fall into three general categories:  (i) statements failing to disclose that the stated purpose

12   of option grants to NVIDIA executives, *i.e*., linking a significant portion of their compensation to the

13   future performance of the Company – was significantly undermined to the detriment of the Company

14   because the option grants described in the proxies were backdated; (ii) misrepresentations that the

15   options granted were priced at the fair market value on the date of grant, when in fact they were

16   fraudulently backdated; and (iii) misrepresentations relating to the amount of compensation received

17   by the defendants in during the backdating period.

18           78.    The Company's proxy statements were submitted to shareholders in connection with

19   the annual election of directors, as well as for shareholder approval of proposals offered by the

20   NVIDIA Board of Directors, including the adoption and/or amendment of the 1998 Equity Incentive

21   Plan and 1998 Non-Employee Directors' Stock Option Plan.  The proxy statements' materially false

22   and misleading statements follow below.

23   **1999 Proxy Statement**

24           79.    NVIDIA's 1999 proxy statement was filed with the SEC, and contemporaneously

25   disseminated to shareholders from California, on or about May 17, 1999.  Defendants Coxe, Gaither,

26   Huang, Jones, Miller, Seawell and Stevens were directors at this time.

27

28

80.     The 1999 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Equity Incentive Plan ("Incentive Plan") and 1998 Non-Employee Directors' Stock Option Plan:

- "The Incentive Plan is administered by the Compensation Committee, which determines the recipients and types of awards to be granted, including the exercise price, number of shares subject to the award and the exercisability thereof."

- **"The Compensation Committee determines the exercise price of options granted under the Incentive Plan.  However, the exercise price for an incentive stock option cannot be less than 100% of the fair market value of the Common Stock on the date of the option grant** . . . ."

- "Each non-employee director of the Company receives nonstatutory stock option grants under the Company's 1998 Non-Employee Directors' Stock Option Plan (the "Directors' Plan"). . . . **The exercise price of the options granted under the Directors' Plan is equal to the fair market value of the Common Stock on the date of grant.**"

81.     These statements were false and misleading because the options granted to NVIDIA's executives and key employees did not carry the fair market value on the date of the grant, but were in fact backdated.  They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

82.     The 1999 proxy also contained false and misleading statements about the pricing of specific option grants to defendants Fisher, Huang, Malachowsky and Priem during the fiscal year. In footnote 3 to the "Stock Option Grant Exercise Table" on page 17, the 1999 proxy stated:

The exercise price per share for Mr. Fisher's option **was equal to the fair market value of the Common Stock on the date of grant as determined by the Board**. **The exercise price per share for each of the options granted to Messrs. Huang, Malachowsky and Priem was equal to 110% of the fair market value of the Common Stock on the date of grant** as determined by the Board, as each owned greater than 10% of the combined voting power of the Company on the date of grant.

83.     These statements were false and misleading when made because they state that option grants made to defendants Fisher, Huang, Malachowsky and Priem were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted in fiscal 1999 were backdated.

84.     In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> The Company's executive compensation policies and practices are established and administered by the Compensation Committee of the Board of Directors (the "Committee"). . . .  ***The Committee's determinations regarding compensation of the Chief Executive Officer and other executive officers are reviewed with all the non-employee directors***.
>
> *              *              *
>
> **Compensation Plans**
>
> *              *              *
>
> Long-term equity incentives are provided through grants of stock options to executive officers and other key employees pursuant to the Company's 1998 Equity Incentive Plan. . . .  The Committee believes this element of the total compensation program directly links the participant's interests with those of the stockholders and the long-term value of the Company.  ***Stock options are granted at not less than fair market value and have value only if the Company's stock price increases***.

85.     These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.

**2000 Proxy Statement**

86.     NVIDIA's 2000 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about May 26, 2000.  Defendants Coxe, Gaither, Huang, Jones, Miller, Seawell and Stevens were directors at this time.

87.     According to the 2000 proxy, the Compensation Committee makes recommendations, which then must be approved by the full NVIDIA Board of Directors concerning salaries and incentive compensation and stock option awards to executives and key employees.

> The Compensation Committee makes recommendations concerning salaries and incentive compensation, awards stock options to employees and consultants under the Company's stock option plans and otherwise determines compensation

levels and performs such other functions regarding compensation as the Board may delegate.

88.     The 2000 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Non-Employee Directors' Stock Option Plan:

> **The exercise price of the options granted under the Directors' Plan is equal to the fair market value of the Common Stock on the date of grant**.

> \*       \*       \*

> In addition, in June 1999, non-employee directors received automatic non-qualified stock option grants under the Director Plan, using the criteria set forth in such Plan. Options to purchase shares of Common Stock in the form of annual grants for service as directors were made to the following directors: Mr. Coxe, 20,000 shares; Mr. Gaither, 5,000 shares; Mr. Jones, 20,000 shares; Mr. Miller, 20,000 shares; Mr. Seawell, 20,000 shares; and Mr. Stevens, 20,000 shares.

89.     These statements were false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated. They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

90.     The 2000 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during the fiscal year ended January 30, 2000.  In footnote 3 to the "Stock Option Grants and Exercises" table on page 11, the 2000 proxy stated:

> The Company grants options to its executive officers under its 1998 Equity Incentive Plan. . . .

> The following tables show for the fiscal year ended January 30, 2000, certain information regarding options granted, to, exercised by, and held at year end, by the Named Executive Officers:

> **Option Grants In Last Fiscal Year**

> \*       \*       \*

> (3) **The exercise price per share of each option was equal to the fair market value of the Common Stock on the date of grant as determined by the Board**.

91.     These statements were false and misleading when made because they state that option grants made to defendants Huang and other NVIDIA insiders were made at prices equal to the fair

1    market value of NVIDIA common stock on the date of grant when, in fact, the options granted

2    during the year ended January 30, 2000 were backdated.

3        92.    In addition, the NVIDIA Board of Directors, through its Compensation Committee

4    (Coxe and Jones), made the following representations regarding the Company's compensation

5    policies and the role played by its stock option plans in aligning the interest of management and

6    shareholders:

7            The Company's executive compensation policies and practices are
         established and administered by the Compensation Committee of the Board of
8        Directors (the "Committee"). . . .  *The Committee's determinations regarding
         compensation of the Chief Executive Officer and other executive officers are
9        reviewed with all the non-employee directors*.

10                          *        *        *

11   **Compensation Plans**

12                          *        *        *

13           Long-term incentives have been in the form of stock options.  The Committee
         believes that equity-based compensation closely aligns the interests of executive
14       officers with those of stockholders by providing an incentive to manage the
         Company with a focus on long-term strategic objectives set by the Board of Directors
15       relating to growth and stockholder value.  Stock options are granted under the 1998
         Equity Incentive Plan. *Stock options are granted at not less than fair market value
16       and have value only if the Company's stock price increases*.

17                          *        *        *

18   **Chief Executive Officer Compensation**

19                          *        *        *

20           *In fiscal 2001, Mr. Huang was also granted an option to acquire 400,000
         shares of common stock at the fair market value of the stock on such date*. . . .
21       This grant was intended to continue to maintain the overall competitiveness of Mr.
         Huang's compensation package and strengthen the alignment of Mr. Huang's
22       interests with those of the stockholders during a critical phase of the Company's
         development.

23

24       93.    These statements were materially false and misleading when made because the

25   NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e*., linking

26   compensation to performance and incentivizing employees to devote their maximum efforts to the

27   success of the Company – was significantly undermined to the detriment of the Company because

28   the option grants to those directors and/or officers were backdated.  The statements were also

materially false and misleading when made because the NVIDIA Board failed to disclosed that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**2001 Proxy Statement**

94.    NVIDIA's 2001 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about June 25, 2001.  Defendants Coxe, Gaither, Huang, Jones, Miller, Seawell and Stevens were directors at this time.

95.    According to the 2001 proxy, the Compensation Committee makes recommendations, which then must be approved by the full NVIDIA Board of Directors, concerning salaries and incentive compensation and stock option awards to executives and key employees.

> The Compensation Committee makes recommendations concerning salaries and incentive compensation, awards stock options to employees and consultants under our stock option plans and otherwise determines compensation levels and performs such other functions regarding compensation as the Board may delegate. . . .   The Compensation Committee consists of three non-employee directors: Messrs. Coxe, Gaither and Jones.  It acted by unanimous written consent five (5) times.

96.    The 2001 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Non-Employee Directors' Stock Option Plan:  "***The exercise price for options granted under the Director Plan Provisions is at least 100% of the fair market value on the date of grant***."

97.    This statement was were false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated.   They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe, Gaither and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

98.    The 2001 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during the fiscal year ended January 28, 2001.  In footnote 3 to the "Stock Option Grants and Exercises" table on page 13, the 2001 proxy stated:

> We grant options to our executive officers under the 1998 Plan. . . .

The following tables show for the fiscal year ended January 28, 2001 certain information regarding options granted to, exercised by, and held at year-end by, the Named Executive Officers:

**Option Grants In Last Fiscal Year**

\* \* \*

(3) *The exercise price per share of each option was equal to the fair market value of the Common Stock on the date of grant as determined by the Board*.

99. These statements were false and misleading when made because they state that option grants made to defendant Huang and other NVIDIA insiders were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted during the year ended January 28, 2001 were backdated.

100. In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

Our executive compensation policies and practices are established and administered by the Compensation Committee of the Board of Directors. . . . *The Committee's determinations regarding compensation of the Chief Executive Officer and other executive officers are reviewed with all the non-employee directors*.

\* \* \*

**Compensation Plans**

\* \* \*

Long-term incentives have been in the form of stock options. We believe that equity-based compensation closely aligns the interests of executive officers with your interests as stockholders, by providing an incentive to manage NVIDIA with a focus on long-term strategic objectives set by the Board of Directors relating to growth and stockholder value. *Stock options are granted under the 1998 Equity Incentive Plan. Stock options are granted at not less than fair market value and have value only if NVIDIA's stock price increases*.

\* \* \*

**Chief Executive Officer Compensation**

\* \* \*

*In fiscal 2001, Mr. Huang was also granted an option to acquire 800,000 shares of common stock at an exercise price of $18.53, which was the fair market*

*value of the stock on such date*. . . .  This grant was intended to continue to maintain the overall competitiveness of Mr. Huang's compensation package and strengthen the alignment of Mr. Huang's interests with those of our stockholders during a critical phase of NVIDIA's development.

101.  These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.  The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**2002 Proxy Statement**

102.  NVIDIA's 2002 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about May 28, 2002.  Defendants Coxe, Gaither, Huang, Jones, Miller, Seawell and Stevens were directors at this time.

103.  According to the 2002 proxy, the Compensation Committee makes recommendations, which then must be approved by the full NVIDIA Board of Directors, concerning salaries and incentive compensation and stock option awards to executives and key employees.

> The Compensation Committee makes recommendations concerning salaries and incentive compensation, awards stock options to employees and consultants under our stock option plans and otherwise determines compensation levels and performs such other functions regarding compensation as the Board may delegate. . . .  The Compensation Committee is comprised of three non-employee directors: Messrs. Coxe, Gaither and Jones.  It met one time during fiscal year 2002 and acted by written consent four times.

104.  The 2002 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Non-Employee Directors' Stock Option Plan:  "*The exercise price for such options is equal to 100% of the fair market value on the date of grant*."

105.  This statement was false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated.

They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe, Gaither and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

106.   The 2002 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during the fiscal year ended January 28, 2001.  In the "Stock Option Grants and Exercises" table on page 19, the 2002 proxy stated:

> We grant options to our executive officers under our 1998 Equity Incentive Plan, the 1998 Plan. . . .  *The exercise price of each option was equal to the closing price of our common stock as reported on the Nasdaq Stock Market for the last market trading day prior to the date of grant*.

107.   These statements were false and misleading when made because they state that option grants made to defendant Huang and other NVIDIA insiders were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted during fiscal 2002 were backdated.

108.   In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> Our executive compensation policies and practices are established and administered by the Compensation Committee of the Board of Directors. . . .  *The Compensation Committee's determinations regarding compensation of the Chief Executive Officer and other executive officers are reviewed with all the non-employee directors*.
>
> *          *          *
>
> **COMPENSATION PLANS**
>
> *          *          *
>
> Long-term incentives have been in the form of stock options.  We believe that equity-based compensation closely aligns the interests of executive officers with your interests as stockholders by providing an incentive to manage NVIDIA with a focus on long-term strategic objectives set by the Board of Directors relating to growth and stockholder value.  *Stock options are granted under the 1998 Equity Incentive Plan.  Stock options are granted at not less than fair market value and have value only if NVIDIA's stock price increases*.
>
> *          *          *

**CHIEF EXECUTIVE OFFICER COMPENSATION**

\*       \*       \*

*In fiscal 2003, Mr. Huang was also granted an option to acquire 250,000 shares of common stock at an exercise price of $37.17, which was the fair market value of the common stock on such date*. . . .  The fiscal 2002 and 2003 grants are intended to continue to maintain the overall competitiveness of Mr. Huang's compensation package and strengthen the alignment of Mr. Huang's interests with those of our stockholders during a critical phase of NVIDIA's development by continuing to provide through an integrated vesting schedule long-term stock incentive compensation.

109.    These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.  The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**2003 Proxy Statement**

110.    NVIDIA's 2003 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about May 20, 2003.  Defendants Coxe, Gaither, Huang, Jones, Miller, Seawell and Stevens were directors at this time.

111.    According to the 2003 proxy, the Compensation Committee makes recommendations, which then must be approved by the full NVIDIA Board of Directors, concerning salaries and incentive compensation and stock option awards to executives and key employees.

The Compensation Committee oversees NVIDIA's salary, incentive compensation and stock option programs for all employees and performs such other functions regarding compensation as the Board may delegate. . . .  *The Compensation Committee reviews and approves individual salary, bonus and stock option awards for the Chief Executive Officer and each member of the executive staff*. . . .  It met four times during fiscal year 2003 and acted by written consent two times.

112.     Similarly, according to the 2003 proxy, the Audit Committee reviews the audited financial statements of the Company and recommends to the full NVIDIA Board of Directors that the financial statements be included in NVIDIA's annual SEC reports on Form 10-K.

In accordance with the Audit Committee's charter, the Audit Committee oversees the quality and integrity of NVIDIA's accounting, auditing and financial reporting practices on behalf of NVIDIA's Board of Directors. . . .  In fulfilling its oversight responsibilities, the Audit Committee reviewed the audited financial statements included in the Annual Report on Form 10-K with management, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity and completeness of the disclosures in the financial statements.

\*          \*          \*

During fiscal 2002 and 2003, the Audit Committee met with members of senior management to review the certifications provided by the Chief Executive Officer and Chief Financial Officer under the Sarbanes-Oxley Act of 2002, the rules and regulations of the SEC and the overall certification process.  At these meetings, NVIDIA officers reviewed each of the Sarbanes-Oxley certification requirements concerning internal and disclosure controls and procedures and any fraud, whether or not material, involving management or other employees with a significant role in NVIDIA's internal and disclosure controls.

***Based on its review of the audited financial statements and the various discussions noted above, the Audit Committee recommended to the Board of Directors that the audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended January 26, 2003 for filing with the SEC***.

113.     The 2003 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Non-Employee Directors' Stock Option Plan: "***The exercise price for such options is equal to 100% of the fair market value on the date of grant***."

114.     This statement was false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated. They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe, Gaither and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

115.     The 2003 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during fiscal 2003.  In the "Stock Option Grants and Exercises" table on page 15, the 2003 proxy stated:

**OPTION GRANTS IN FISCAL 2003**

> *We grant options to our executive officers under our 1998 Equity Incentive Plan, or the 1998 Plan*. . . .   The exercise price of each option was equal to the closing price of our common stock as reported on the Nasdaq Stock Market for the last market trading day prior to the date of grant.

116.   These statements were false and misleading when made because they state that option grants made to defendant Huang and other NVIDIA insiders were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted during fiscal 2003 were backdated.

117.   In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> Our executive compensation policies and practices are established and administered by the Compensation Committee of the Board of Directors. . . .   *The Compensation Committee's determinations regarding compensation of the Chief Executive Officer and other executive officers are reviewed with all the non-employee directors*.

> *             *             *

**COMPENSATION PLANS**

> *             *             *

> *Long-Term Incentives*.  Long-term incentives have been in the form of stock options.  We believe that equity-based compensation closely aligns the interests of executive officers with your interests as stockholders by providing an incentive to manage NVIDIA with a focus on long-term strategic objectives set by the Board of Directors relating to growth and stockholder value.  *Stock options are granted under the 1998 Equity Incentive Plan.  Stock options are granted at not less than fair market value*.

> *             *             *

**CHIEF EXECUTIVE OFFICER COMPENSATION**

> *             *             *

> *In fiscal 2004, Mr. Huang was granted an option to acquire 200,000 shares of common stock at an exercise price of $13.41, which was the fair market value of the common stock as of the date of grant*. . . .   The fiscal 2003 and 2004 grants are intended to continue to maintain the overall competitiveness of the Mr. Huang's compensation package and strengthen the alignment of Mr. Huang's interests with

those of our stockholders during this critical phase of NVIDIA's development by continuing to provide long-term stock incentive compensation.

118.    These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e*., linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.  The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**2004 Proxy Statement**

119.    NVIDIA's 2004 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about July 9, 2004.  Defendants Chu, Coxe, Gaither, Huang, Jones, Miller, Seawell and Stevens were directors at this time.

120.    According to the 2004 proxy, the Audit Committee reviews the audited financial statements of the Company and recommends to the full NVIDIA Board of Directors that the financial statements be included in NVIDIA's annual SEC reports on Form 10-K.

> The Audit Committee of the Board oversees NVIDIA's corporate accounting and financial reporting process.  In fulfilling this responsibility, the Audit Committee:
>
> *            *            *
>
> •     ***reviews the financial statements to be included in NVIDIA's Annual Report on Form 10-K*** . . . .

121.    Likewise, the Audit Committee's Charter stated:

> The Audit Committee has an annual agenda that includes reviewing our financial statements, internal controls and audit matters.  ***The Audit Committee meets each quarter with management and the internal and independent auditors to review our interim financial results before the publication of earnings releases, to discuss the results of examinations by the internal and independent auditors, and to discuss various topics and events that may have significant financial impact or are the subject of discussions between management and the independent auditors***.  During fiscal 2004, the Audit Committee separately met with the internal and independent auditors, with and without management, to discuss the results of their

examinations and their observations and recommendations regarding our internal controls.

> ***During fiscal 2004, the Audit Committee met with members of senior management to review the certifications provided by the Chief Executive Officer and Chief Financial Officer under the Sarbanes-Oxley Act of 2002, the rules and regulations of the SEC and the overall certification process.*** At these meetings, NVIDIA officers reviewed each of the Sarbanes-Oxley certification requirements concerning internal and disclosure controls and procedures and any fraud, whether or not material, involving management or other employees with a significant role in NVIDIA's internal and disclosure controls.

> ***Based on the Audit Committee's review and discussions referred to above, the Audit Committee recommended to the NVIDIA's Board of Directors that NVIDIA's audited financial statements be included in NVIDIA's Annual Report on Form 10-K for the fiscal year ended January 25, 2004 for filing with the SEC***.

122.    The 2004 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Non-Employee Directors' Stock Option Plan:

> We automatically grant stock options to our directors who are not employees of NVIDIA or our subsidiaries under the 1998 Non-Employee Directors' Stock Option Plan (the Directors' Plan) and the 1998 Equity Incentive Plan (the 1998 Plan).

> \*          \*          \*

> *General Provisions.* ***The exercise price for such options is equal to 100% of the fair market value on the date of grant, as determined by the closing price of our common stock on Nasdaq on the day preceding the date of grant***.

123.    These statements were false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated. They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe, Gaither and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

124.    The 2004 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during fiscal 2004. In the "Stock Option Grant Exercise Table" on page 24, the 2004 proxy stated:

**Option Grants in Fiscal 2004**

> We grant options to our executive officers under our 1998 Equity Incentive Plan, or the 1998 Plan. . . . ***The exercise price of each option was equal to the closing price of our common stock as reported on Nasdaq for the last market-trading day prior to the date of grant***.

125.     These statements were false and misleading when made because they state that option grants made to defendant Huang and other NVIDIA insiders were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted during fiscal 2004 were backdated.

126.     In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> Our compensation policies and practices are established and administered by the Compensation Committee of the Board. . . . **The Compensation Committee's determinations regarding compensation of the Chief Executive Officer are reviewed with all the non-employee directors**.

> *                *                *

> *Executive Equity Compensation Practices*.  We continue to provide equity incentives in the form of stock options.  **Stock options for executives are granted under our 1998 Equity Incentive Plan at not less than fair market value**.

> *                *                *

> **Chief Executive Officer Compensation**

> *                *                *

> **In fiscal 2005, Mr. Huang was granted an option to acquire 200,000 shares of common stock at an exercise price of $26.24, which was the fair market value of the common stock as of the date of grant**. . . .  The fiscal 2004 and 2005 grants are intended to continue to maintain the overall competitiveness of Mr. Huang's compensation package by providing long-term incentives and, therefore, vesting on such grants was set to commence in 2007 and 2008, respectively, thereby strengthening the alignment of Mr. Huang's interests with those of our stockholders during this critical phase of NVIDIA's development by continuing to provide long-term stock incentive compensation.

127.     These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.  The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the

1  option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the

2  date of grant.

3  **2005 Proxy Statement**

4      128.    NVIDIA's 2005 proxy statement was filed with the SEC, and contemporaneously

5  disseminated to shareholders from California, on or about May 31, 2005.  Defendants Coxe, Gaither,

6  Huang, Jones, Miller, Perry, Seawell and Stevens were directors at this time.

7      129.    According to the 2005 proxy, the Audit Committee reviews the audited financial

8  statements of the Company and recommends to the full NVIDIA Board of Directors that the

9  financial statements be included in NVIDIA's annual SEC reports on Form 10-K.

10         The Audit Committee of the Board oversees our corporate accounting and
   financial reporting process.  In fulfilling this responsibility, the Audit Committee:

11                              *       *       *

12      •    confers with management and our independent registered public accounting
            firm regarding the effectiveness of internal control over financial reporting;

13
14                              *       *       *

15      •    reviews the financial statements to be included in our annual report; . . . .

16      130.    Likewise, the Audit Committee's Charter stated:

17
           During the course of fiscal 2005, management completed the documentation,
   testing and evaluation of the Company's system of internal control over financial
18  reporting as a result of the requirements set forth in Section 404 of the Sarbanes-
   Oxley Act and related regulations.  *The Audit Committee was kept apprised of the*
19  *progress of the evaluation and provided oversight and advice to management*
   *during the process*.  In connection with this oversight, the Audit Committee received
20  periodic updates at its meetings.  Once the documentation, testing and evaluation
   were completed, *the Audit Committee reviewed and discussed with management its*
21  *assessment and report on the effectiveness of the Company's internal control over*
   *financial reporting as of January 30, 2005*.  During fiscal 2005, the Audit
22  Committee met separately with members of the Company's Internal Audit
   department and independent registered public accounting firm, with and without
23  management, to discuss the results of their examinations and their observations and
   recommendations regarding the Company's internal control over financial
24  reporting. . . .

25         *Based on the Audit Committee's review and discussions referred to above,*
   *the Audit Committee recommended to the Board that the audited consolidated*
26  *financial statements be included in the annual report for fiscal 2005*.

27

28

131.   The 2005 proxy contained at least the following materially false and misleading statements about the operation and administration of NVIDIA's 1998 Equity Incentive Plan and 1998 Non-Employee Directors' Stock Option Plan:

Options to purchase shares of our common stock are automatically granted to our non-employee directors under our 1998 Non-Employee Directors' Stock Option Plan, or the Directors' Plan, and our 1998 Equity Incentive Plan, or the 1998 Plan. . . .

. . . Under the Directors' Plan, each non-employee director who is elected or appointed to our Board for the first time is automatically granted an option to purchase 75,000 shares on the date of election or appointment, which vests quarterly over a three-year period *and has an exercise price equal to 100% of the closing price of our common stock as reported by Nasdaq for the last market-trading day prior to the date of grant*. On May 17, 2005, Mr. Perry was automatically granted an option to purchase 75,000 shares of our common stock at an exercise price of $25.42 per share.

132.   These statements were false and misleading because the options granted to NVIDIA's directors did not carry the fair market value on the date of the grant, but were in fact backdated. They were also false and misleading because they failed to disclose that the Compensation Committee (defendants Coxe, Gaither and Jones) had permitted other NVIDIA executives to backdate option grants to maximize their own profits, at the expense of the Company.

133.   The 2005 proxy also contained false and misleading statements about the pricing of option grants to NVIDIA executives during fiscal 2005.  In the "Stock Option Grant Exercise Table" on page 26, the 2005 proxy stated:

**Option Grants in Fiscal 2005**

We grant options to purchase shares of our common stock to our named executive officers under our 1998 Equity Incentive Plan, or the 1998 Plan. . . . *The exercise price of each option was equal to the closing price of our common stock as reported by Nasdaq for the last market-trading day prior to the date of grant*.

134.   These statements were false and misleading when made because they state that option grants made to defendant Huang and other NVIDIA insiders were made at prices equal to the fair market value of NVIDIA common stock on the date of grant when, in fact, the options granted during fiscal 2005 were backdated.

135.   In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's

compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> The Compensation Committee annually evaluates and establishes the compensation policies for the chief executive officer and other members of senior management including the named executive officers. Messrs. Jones (Chairman), Coxe and Gaither, all non-employee directors, comprise the Compensation Committee. **The Compensation Committee reviews its determinations regarding executive compensation with all of the non-employee directors**.

> \*          \*          \*

> **Compensation Plans and Actions**

> \*          \*          \*

> The Committee continues to provide equity incentives to executive officers and senior management in the form of stock options, which are granted under the Company's 1998 Equity Incentive Plan **at not less than the closing price of the Company's common stock as reported on the Nasdaq National Market, or Nasdaq, for the last market-trading day prior to the date of grant**.

> \*          \*          \*

> **Chief Executive Officer Compensation**

> \*          \*          \*

> **During the first quarter of fiscal 2005, the Committee awarded Mr. Huang a performance stock option grant to purchase 200,000 shares of the Company's common stock. The exercise price for the stock option is $26.24 a share, which was equal to the closing price of the Company's common stock as reported by Nasdaq for the last market-trading day prior to the date of grant**. . . . The fiscal 2005 grant was intended to continue to maintain the overall competitiveness of Mr. Huang's compensation package by providing long-term incentives and, therefore, vesting on such grant was set to occur only in 2008, thereby strengthening the alignment of Mr. Huang's interests with those of the stockholders.

136.   These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated. The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**2006 Proxy Statement**

137.    NVIDIA's 2006 proxy statement was filed with the SEC, and contemporaneously disseminated to shareholders from California, on or about May 12, 2006.  Defendants Coxe, Gaither, Huang, Jones, Miller, Perry and Seawell were directors at this time.

138.    According to the 2006 proxy, the Audit Committee reviews the audited financial statements of the Company and recommends to the full NVIDIA Board of Directors that the financial statements be included in NVIDIA's annual SEC reports on Form 10-K.

> In this context, ***the Audit Committee reviewed and discussed the audited consolidated financial statements for fiscal 2006 and the Company's internal control over financial reporting with management and PwC***.  Specifically, the Audit Committee has discussed with PwC the matters required to be discussed by Statement on Auditing Standards No. 61, as amended, as well as the auditors' independence from management and NVIDIA, including the matters in the written disclosures and the letter from the independent registered public accounting firm received by the Audit Committee in accordance with the requirements of the Independence Standards Board Standard No. 1.  The Audit Committee has also considered whether the provision of certain permitted non-audit services by the PwC is compatible with PwC's independence and discussed PwC's independence with PwC.

> ***Based on the Audit Committee's review and discussions, the Audit Committee recommended to the Board of Directors that the audited consolidated financial statements be included in the annual report for fiscal 2006***.

139.    The 2006 proxy contained false and misleading statements about the pricing of option grants to NVIDIA executives during fiscal 2006.  In the "Stock Option Grants and Exercises" table on page 24, the 2006 proxy stated:

### STOCK OPTION GRANTS AND EXERCISES

**Option Grants in Fiscal 2006**

> We grant options to purchase shares of our common stock to our named executive officers under our 1998 Equity Incentive Plan, or the 1998 Plan. . . .  The following table presents each stock option grant during fiscal 2006 to each of the named executive officers.  ***The exercise price of each option was equal to the closing price of our common stock as reported by NASDAQ for the last market-trading day prior to the date of grant with the exception of an option to purchase 100,000 shares which was granted to Mr. Huang at a premium of $2.29 on the date of grant***.

140.    These statements were false and misleading when made because they state that option grants made to defendants Huang and other NVIDIA insiders were made at prices equal to the fair

market value of NVIDIA common stock on the date of grant when, in fact, the options granted during fiscal 2006 were backdated.

141.    In addition, the NVIDIA Board of Directors, through its Compensation Committee (Coxe, Gaither and Jones), made the following representations regarding the Company's compensation policies and the role played by its stock option plans in aligning the interest of management and shareholders:

> The Board of Directors has delegated the power and authority to review, modify and approve compensation policies and practices and to administer the Company's equity plans to the Compensation Committee, or Committee. . . . **The Committee reviews its determinations regarding executive compensation with all of the non-employee directors**.  **The Board did not reject or modify any of the recommendations of the Committee in fiscal 2006**.
>
> *        *        *
>
> **Compensation Actions and Compensation Programs**
>
> *        *        *
>
> *Equity Compensation*.  Equity compensation, which the Committee considers to be long term compensation, is an integral component of the Company's efforts to attract and retain exceptional executives, senior management and world-class employees.  The Committee believes that properly structured equity compensation aligns the long-term interests of stockholders and employees by creating a strong, direct link between employee compensation and stock appreciation as stock options are only valuable to the employee if the value of the Company's common stock increases after the date of grant.
>
> *        *        *
>
> **Grants under the Company's 1998 Equity Incentive Plan are made at the closing price of the Company's common stock as reported on NASDAQ for the last market-trading day prior to the date of grant**.
>
> *        *        *
>
> **Chief Executive Officer Compensation**
>
> *        *        *
>
> The Committee also reviewed Mr. Huang's equity compensation and determined that increasing Mr. Huang's long-term incentive was appropriate.  **The Committee awarded Mr. Huang a stock option grant to purchase 300,000 shares of the Company's common stock at an exercise price of $28.735 a share, which was equal to the closing price of the Company's common stock as reported by NASDAQ for the last market-trading day prior to the date of grant**.

142.     These statements were materially false and misleading when made because the NVIDIA Board of Directors failed to disclose that the stated purpose of option grants – *i.e.*, linking compensation to performance and incentivizing employees to devote their maximum efforts to the success of the Company – was significantly undermined to the detriment of the Company because the option grants to those directors and/or officers were backdated.   The statements were also materially false and misleading when made because the NVIDIA Board failed to disclose that the option grant to defendant Huang was not at the fair market value of NVIDIA common stock on the date of grant.

**False Form 10-K Reports**

143.     In addition to issuing false proxy statements, defendants also successfully concealed the existence of the stock option backdating scheme by repeatedly making false statements about NVIDIA's stock options and stock option granting practices in its annual reports on Form 10-K.   As demonstrated below, while the backdating scheme was thriving at NVIDIA, defendants consistently lied to shareholders by stating that incentive options under NVIDIA's stockholder plans were made at fair market value on the date of grant.

**1999 Form 10-K405**

144.     On or about April 29, 1999, NVIDIA filed its 1999 Report on Form 10-K405 with the SEC.  The Form 10-K405 included NVIDIA's financial statements for the period ended January 31, 1999, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated and misdated stock option grants.   As a result, NVIDIA's compensation expense was understated and its net income and earnings were overstated.

145.     In addition, the 1999 Report on Form 10-K405 made the following representations regarding the administration of and accounting for NVIDIA's stock options:

1998 Equity Incentive Plan

The Equity Incentive Plan (the "Plan"), as amended and restated on February 17, 1998, provides for the issuance of up to 15,000,000 shares of the Company's common stock to directors, employees and consultants. . . .

***Pursuant to the Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant*** or for employees owning in

excess of 10% of the voting power of all classes of stock, 110% of the fair market value on the date of grant.

\*          \*          \*

***The Company accounts for the plan using the intrinsic value method***.  As such, compensation expense is recorded if on the date of grant the current fair value per share of the underlying stock exceeds the exercise price per share. . . .

Non-Employee Directors' Stock Option Plan

In February 1998, the Board adopted the 1998 Non-Employee Directors' Stock Option Plan (the "Directors' Plan") to provide for the automatic grant of options to purchase shares of common stock to directors of the Company who are not employees of or consultants to the Company or an affiliate of the Company (a "Non-Employee Director").  The Compensation Committee administers the Directors' Plan.  The aggregate number of shares of common stock that may be issued pursuant to options granted under the Directors' Plan is 300,000 shares.

Stock-Based Compensation

***As permitted under Statement of Financial Accounting Standards No. 123, ("SFAS 123"), the Company has elected to follow Accounting Principles Board Opinion No. 25 ("APB 25") and related Interpretations in accounting for stock-based awards to employees***.

146.     As detailed above, these statements were knowingly false and misleading when made because defendants made incentive stock option awards to themselves and other top NVIDIA executives at prices that were less than equal to 100% of the fair market value of NVIDIA common stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing statements were false and misleading when made because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

147.     The 1999 Form 10-K405 was signed by defendants Huang, Hoberg, Gaither, Jones, Miller and Seawell, and enabled defendants to conceal the existence of the backdating scheme from shareholders at all times relevant to this action.

**2000 Form 10-K405**

148.     On or about March 13, 2000, NVIDIA filed its 2000 Report on Form 10-K405 with the SEC.  The Form 10-K405 included NVIDIA's financial statements for the period ended January 30, 2000, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated and misdated stock option grants.  As a result, NVIDIA's compensation expense was understated and its net income and earnings were overstated.

149.   In addition, the 2000 Report on Form 10-K405 made the following representations regarding the administration of and accounting for NVIDIA's stock options:

1998 Equity Incentive Plan

The Equity Incentive Plan (the "Plan"), as amended and restated on February 17, 1998, provides for the issuance of up to 15,000,000 shares of the Company's common stock to directors, employees and consultants. . . .

*Pursuant to the Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant* or for employees owning in excess of 10% of the voting power of all classes of stock, 110% of the fair market value on the date of grant. . . .

\*       \*       \*

*The Company accounts for the plan using the intrinsic value method*.  As such, compensation expense is recorded if on the date of grant the current fair value per share of the underlying stock exceeds the exercise price per share. . . .

Non-Employee Directors' Stock Option Plan

In February 1998, the Board adopted the 1998 Non-Employee Directors' Stock Option Plan (the "Directors' Plan") to provide for the automatic grant of options to purchase shares of common stock to directors of the Company who are not employees of or consultants to the Company or an affiliate of the Company (a "Non-Employee Director").  The Compensation Committee administers the Directors' Plan.  The aggregate number of shares of common stock that may be issued pursuant to options granted under the Directors' Plan is 300,000 shares.

Stock-Based Compensation

*As permitted under Statement of Financial Accounting Standards No. 123, ("SFAS 123"), the Company has elected to follow Accounting Principles Board Opinion No. 25 ("APB 25") and related Interpretations in accounting for stock-based awards to employees*.

150.   As detailed above, these statements were knowingly false and misleading when made because defendants made incentive stock option awards to themselves and other top NVIDIA executives at prices that were less than equal to 100% of the fair market value of NVIDIA common stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing statements were false and misleading when made because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

151.   The 2000 Form 10-K405 was signed by defendants Huang, Hoberg, Coxe, Gaither, Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the backdating scheme from shareholders at all times relevant to this action.

1  **2001 Form 10-K405**

2  152.   On or about April 27, 2001, NVIDIA filed its 2001 Report on Form 10-K405 with the

3  SEC.  The Form 10-K405 included NVIDIA's financial statements for the period ended January 28,

4  2001, which were materially false and misleading and presented in violation of GAAP, due to

5  improper accounting for backdated and misdated stock option grants.  As a result, NVIDIA's

6  compensation expense was understated and its net income and earnings were overstated.

7  153.   In addition, the 2001 Report on Form 10-K405 made the following representations

8  regarding the administration of and accounting for NVIDIA's stock options:

9  1998 Equity Incentive Plan

10  The 1998 Plan provides for the issuance of the Company's common stock to
    directors, employees and consultants. . . .

11
12  *Pursuant to the 1998 Plan, the exercise price for incentive stock options is
    at least 100% of the fair market value on the date of grant* or for employees owning
    in excess of 10% of the voting power of all classes of stock, 110% of the fair market
13  value on the date of grant. . . .

14  *       *       *

15  1998 Non-Employee Directors' Stock Option Plan

16  In February 1998, the Board adopted the 1998 Non-employee Directors'
    Stock Option Plan (the "Directors Plan") to provide for the automatic grant of
17  options to purchase shares of the Company's common stock to directors of the
    Company who are not employees or consultants of the Company or of an affiliate of
18  the Company. . . .

19  *       *       *

20  Initial Grants vest monthly over a four-year period and become exercisable
    on the fourth anniversary of the date of grant. . . .  *The exercise price for such*
21  *options is at least 100% of the fair market value on the date of grant*. . . .

22  *       *       *

23  Stock-Based Compensation

24  The Company accounts for the 1998 and 2000 plans using the intrinsic value
    method.  As such, compensation expense is recorded if on the date of grant the
25  current fair value per share of the underlying stock exceeds the exercise price per
    share. . . .

26
    As permitted under Statement of Financial Accounting Standards No. 123,
27  ("SFAS 123"), the Company has elected to follow Accounting Principles Board
    Opinion No. 25 ("APB 25") and related Interpretations in accounting for stock-
28  based awards to employees.

154.    As detailed above, these statements were knowingly false and misleading when made because defendants made incentive stock option awards to themselves and other top NVIDIA executives at prices that were less than equal to 100% of the fair market value of NVIDIA common stock on the date of grant, in direct violation of the Company's stock option plans. The foregoing statements were false and misleading when made because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

155.    The 2001 Form 10-K405 was signed by defendants Huang, Hoberg, Coxe, Gaither, Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the backdating scheme from shareholders at all times relevant to this action.

**2002 Form 10-K**

156.    On or about May 14, 2002, NVIDIA filed its 2002 Report on Form 10-K with the SEC. The Form 10-K included NVIDIA's financial statements for the period ended January 27, 2002, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated and misdated stock option grants. As a result, NVIDIA's compensation expense was understated and its net income and earnings were overstated.

157.    In addition, the 2002 Report on Form 10-K made the following representations regarding the administration of and accounting for NVIDIA's stock options:

*1998 Equity Incentive Plan*

The 1998 Plan provides for the issuance of the Company's common stock to directors, employees and consultants. . . .

***Pursuant to the 1998 Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant*** or for employees owning in excess of 10% of the voting power of all classes of stock, 110% of the fair market value on the date of grant. . . .

*1998 Non-Employee Directors' Stock Option Plan*

In February 1998, the Board adopted the 1998 Non-Employee Directors' Stock Option Plan (the "Directors Plan") to provide for the automatic grant of options to purchase shares of the Company's common stock to directors of the Company who are not employees or consultants of the Company or of an affiliate of the Company. . . .

Initial Grants vest monthly over a four-year period and become exercisable on the fourth anniversary of the date of grant. . . . ***The exercise price for such options is at least 100% of the fair market value on the date of grant***. . . .

*       *       *

*Stock-Based Compensation*

The Company accounts for the 1998 Plan and 2000 Plan using the intrinsic value method.  As such, compensation expense is recorded if on the date of grant the current fair value per share of the underlying stock exceeds the exercise price per share. . . .

As permitted under Statement of Financial Accounting Standards No. 123, the Company has elected to follow Accounting Principles Board Opinion No. 25 and related Interpretations in accounting for stock-based awards to employees.

158.    As detailed above, these statements were knowingly false and misleading when made because defendants made incentive stock option awards to themselves and other top NVIDIA executives at prices that were less than equal to 100% of the fair market value of NVIDIA common stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing statements were false and misleading when made because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

159.    The 2002 Form 10-K was signed by defendants Huang, Dotz, Coxe, Gaither, Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the backdating scheme from shareholders at all times relevant to this action.

**2003 Form 10-K**

160.    On or about April 25, 2003, NVIDIA filed its 2003 Report on Form 10-K with the SEC.  The Form 10-K included NVIDIA's financial statements for the period ended January 26, 2003, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated and misdated stock option grants.  As a result, NVIDIA's compensation expense was understated and its net income and earnings were overstated.

161.    In addition, the 2003 Report on Form 10-K made the following representations regarding the administration of and accounting for NVIDIA's stock options:

1998 Equity Incentive Plan

The 1998 Plan provides for the issuance of the Company's common stock to directors, employees and consultants. . . .

***Pursuant to the 1998 Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant*** or for employees owning

in excess of 10% of the voting power of all classes of stock, 110% of the fair market value on the date of grant.

162.     As detailed above, these statements were knowingly false and misleading when made because defendants made incentive stock option awards to themselves and other top NVIDIA executives at prices that were less than equal to 100% of the fair market value of NVIDIA common stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing statements were false and misleading when made because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

163.     The 2003 Form 10-K was signed by defendants Huang, Burkett, Coxe, Gaither, Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the backdating scheme from shareholders at all times relevant to this action.

**2004 Form 10-K/A**

164.     On or about May 20, 2004, NVIDIA filed its 2004 Report on Form 10-K/A with the SEC.  The Form 10-K/A included NVIDIA's financial statements for the period ended January 25, 2004, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated and misdated stock option grants.  As a result, NVIDIA's compensation expense was understated and its net income and earnings were overstated.

165.     In addition, the 2004 Report on Form 10-K/A made the following representations regarding the administration of and accounting for NVIDIA's stock options:

*2000 Nonstatutory Equity Incentive Plan*

\*          \*          \*

*1998 Equity Incentive Plan*

The 1998 Plan provides for the issuance of our common stock to directors, employees and consultants. . . .

***Pursuant to the 1998 Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant*** or for employees owning in excess of 10% of the voting power of all classes of stock, 110% of the fair market value on the date of grant. . . .

\*          \*          \*

*Stock-Based Compensation*

1                                        \*        \*        \*

2         ***We use the intrinsic value method, as prescribed by Accounting Principles***

3    ***Board Opinion No. 25, Accounting for Stock Issued to Employees, to account for our stock-based employee compensation plans***. As such, compensation expense is

4    recorded if on the date of grant the current fair value per share of the underlying stock exceeds the exercise price per share.

5       166.   As detailed above, these statements were knowingly false and misleading when made

6 because defendants made incentive stock option awards to themselves and other top NVIDIA

7 executives at prices that were less than equal to 100% of the fair market value of NVIDIA common

8 stock on the date of grant, in direct violation of the Company's stock option plans. The foregoing

9 statements were false and misleading when made because the Company did not report the excess

10 compensation expense arising from the secret options backdating scheme detailed herein.

11       167.   The 2004 Form 10-K/A was signed by defendants Huang, Burkett, Coxe, Gaither,

12 Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the

13 backdating scheme from shareholders at all times relevant to this action.

14 **2005 Form 10-K**

15       168.   On or about March 22, 2005, NVIDIA filed its 2005 Report on Form 10-K with the

16 SEC. The Form 10-K included NVIDIA's financial statements for the period ended January 30,

17 2005, which were materially false and misleading and presented in violation of GAAP, due to

18 improper accounting for backdated and misdated stock option grants. As a result, NVIDIA's

19 compensation expense was understated and its net income and earnings were overstated.

20       169.   In addition, the 2005 Report on Form 10-K made the following representations

21 regarding the administration of and accounting for NVIDIA's stock options:

22    *1998 Equity Incentive Plan*

23    The 1998 Plan provides for the issuance of our common stock to directors, employees and consultants. . . .

24

25        ***Pursuant to the 1998 Plan, the exercise price for incentive stock options is at least 100% of the fair market value on the date of grant*** or for employees owning in excess of 10% of the voting power of all classes of stock, 110% of the fair market

26    value on the date of grant. . . .

27                                          \*        \*        \*

28    *Stock-Based Compensation*

CONSOLIDATED VERIFIED SHAREHOLDERS DERIVATIVE COMPLAINT - C-06-06110-SBA    - 59 -

1                                 *        *        *

2          ***We use the intrinsic value method, as prescribed by Accounting Principles***
           ***Board Opinion No. 25, Accounting for Stock Issued to Employees, to account for***
3          ***our stock-based employee compensation plans***.  As such, compensation expense is
           recorded if on the date of grant the current fair value per share of the underlying
4          stock exceeds the exercise price per share.

5          170.   As detailed above, these statements were knowingly false and misleading when made

6   because defendants made incentive stock option awards to themselves and other top NVIDIA

7   executives at prices that were less than equal to 100% of the fair market value of NVIDIA common

8   stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing

9   statements were false and misleading when made because the Company did not report the excess

10  compensation expense arising from the secret options backdating scheme detailed herein.

11         171.   The 2005 Form 10-K was signed by defendants Huang, Burkett, Coxe, Chu, Gaither,

12  Jones, Miller, Seawell and Stevens, and enabled defendants to conceal the existence of the

13  backdating scheme from shareholders at all times relevant to this action.

14  **2006 Form 10K**

15         172.   On or about March 16, 2006, NVIDIA filed its 2006 Report on Form 10-K with the

16  SEC.  The Form 10-K included NVIDIA's financial statements for the period ended January 29,

17  2006, which were materially false and misleading and presented in violation of GAAP, due to

18  improper accounting for backdated and misdated stock option grants.  As a result, NVIDIA's

19  compensation expense was understated and its net income and earnings were overstated.

20         173.   In addition, the 2006 Report on Form 10-K made the following representations

21  regarding the administration of and accounting for NVIDIA's stock options:

22         *1998 Equity Incentive Plan*

23         The 1998 Plan provides for the issuance of our common stock to directors,
           employees and consultants. . . .
24
                  ***Pursuant to the 1998 Plan, the exercise price for incentive stock options is***
25         ***at least 100% of the fair market value on the date of grant*** or for employees owning
           in excess of 10% of the voting power of all classes of stock, 110% of the fair market
26         value on the date of grant.

27                                *        *        *

28         *Stock-Based Compensation*

CONSOLIDATED VERIFIED SHAREHOLDERS DERIVATIVE  COMPLAINT - C-06-06110-SBA        - 60 -

1                                    *        *        *

2         ***We use the intrinsic value method, as prescribed by Accounting Principles
   Board Opinion No. 25, Accounting for Stock Issued to Employees, to account for
3   our stock-based employee compensation plans***.  As such, compensation expense is
   recorded if on the date of grant the current fair value per share of the underlying
4   stock exceeds the exercise price per share.

5         174.    As detailed above, these statements were knowingly false and misleading when made

6   because defendants made incentive stock option awards to themselves and other top NVIDIA

7   executives at prices that were less than equal to 100% of the fair market value of NVIDIA common

8   stock on the date of grant, in direct violation of the Company's stock option plans.  The foregoing

9   statements were false and misleading when made because the Company did not report the excess

10  compensation expense arising from the secret options backdating scheme detailed herein.

11        175.    The 2006 Form 10-K was signed by defendants Huang, Burkett, Coxe, Chu, Gaither,

12  Jones, Perry, Miller and Seawell, and enabled defendants to conceal the existence of the backdating

13  scheme from shareholders at all times relevant to this action.

14                                **UNLAWFUL INSIDER SALES**

15        176.    Throughout the relevant period, defendants exercised many of these stock options

16  contributing to their ability to sell over $358.8 million worth of NVIDIA stock they obtained often

17  by cashing in underpriced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| HUANG | 05/23/00-05/22/06 | 5,304,974 | $99,467,430 |
| SHANNON | 03/07/05-05/05/06 | 231,841 | $6,722,126 |
| PRIEM | 12/17/99-03/06/00 | 600,000 | $3,915,200 |
| STEVENS | 08/31/99-02/28/06 | 2,430,654 | $23,420,278 |
| VIVOLI | 06/02/03-01/03/06 | 475,256 | $6,192,532 |
| FISHER | 08/23/99-03/01/06 | 3,076,600 | $45,029,086 |
| COXE | 11/27/01-09/30/05 | 520,000 | $12,010,000 |
| HOBERG | 12/07/99-12/07/01 | 1,410,430 | $18,887,214 |
| SEAWELL | 05/23/00-03/14/06 | 476,400 | $9,886,040 |
| MALACHOWSKY | 08/23/99-06/07/02 | 5,295,920 | $63,044,325 |
| GAITHER | 05/25/99-09/02/05 | 609,608 | $6,249,704 |
| JONES | 03/01/00-03/21/06 | 1,160,000 | $19,553,364 |
| MILLER | 03/03/00-03/30/06 | 1,679,504 | $31,373,368 |
| **TOTAL** | | **23,631,187** | **$358,891,867** |

**ENTIRE FAIRNESS APPLIES**

177.    Because defendants both granted and received unlawfully backdated options, they stood on both sides of the transaction and their misconduct may not be sanctioned unless they bear their burden to demonstrate the entire fairness of the actions, a burden they cannot discharge.

178.    Because defendants' misconduct is to be scrutinized under the standard of entire fairness, defendants are not entitled to any presumption that their misconduct was taken in accordance with the proper exercise of business judgment.

179.    Because defendants' misconduct was in breach of their duty of loyalty and undertaken in bad faith, their misconduct cannot be shielded by any exculpatory provision in the Company's articles of incorporation that purports to limit defendant's liability for actions that violate their duty of care.

**DAMAGE TO NVIDIA**

180.    The backdating of stock option grants and issuance thereof in the amounts awarded to defendants caused, and continues to cause, substantial harm to NVIDIA.  Backdating stock option grants represents a direct and continuing waste of valuable corporate assets.  Because NVIDIA is the counterparty to the option contracts, when the defendants exercise their backdated options, money is siphoned on a dollar-for-dollar basis directly from NVIDIA.  The result is that the backdated grants give the defendants an option to purchase NVIDIA shares directly from the Company at an unfair and improper low price, with the Company making up the difference.

181.    Backdating stock options also severely undermines the incentives that justify the use of stock options.  Stock option compensation is intended to encourage management to maximize the return to shareholders by aligning the interests of management with those of shareholders.  However, defendants caused themselves and their colleagues to receive stock option grants backdated to correspond to low points in the stock price.  The backdating created a perverse incentive for defendants to engineer dips and volatile swings in the stock price.  The option backdating also may cause NVIDIA to violate the Internal Revenue Code, since compensation from exercised stock options issued under the backdating scheme was likely nondeductible under Section 162(m).

182.     Among other harms suffered and that may be suffered by the Company, backdating stock options has further caused the Company to incur the time and expenses required to investigate defendants' improper backdating scheme; subjects the Company to the possibility of being required to pay back taxes, fines and penalties to the IRS; and subjects the Company to possible damages, fines and penalties that the SEC and/or other governmental agencies may impose, with the possibility of further investigation costs and possible enforcement actions.

### TOLLING OF APPLICABLE LIMITATION PERIODS

183.     The claims asserted herein are timely.  As an initial matter, defendants wrongfully concealed their manipulation of NVIDIA's stock option plans, through a continuous, integrated and systematic stock option backdating scheme, by issuing false and misleading proxy statements, by falsely reassuring NVIDIA's shareholders that NVIDIA's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically-timed option grants were issued based on the manipulation of insider information that ensured the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

184.     NVIDIA's shareholders and the investing public had no reason to know of defendants' breach of their fiduciary duties until at least August 2006, when it was announced that NVIDIA had commenced an internal investigation into its historical stock option practices and related accounting.  Within weeks of the August 10, 2006 public disclosure of backdating practices at NVIDIA, plaintiffs conducted with the assistance of counsel an investigation of NVIDIA's prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices, and expeditiously brought this action.  Finally, as fiduciaries of NVIDIA and its shareholders, defendants cannot rely on any limitations defense where they withheld from NVIDIA's shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the option grant dates to defendants had been manipulated to maximize the profit for the grant recipients.

185.     Further, plaintiffs' ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence.  It would be unreasonable to expect plaintiffs – typical shareholders – to undertake costly and extensive academic research and statistical analysis when

defendants' false public statements indicated that stock options were being properly granted.  In any case, plaintiffs were entitled to rely upon the truthfulness of the disclosures contained within NVIDIA's public statements and SEC filings.

**DERIVATIVE ALLEGATIONS**

186.   Plaintiffs incorporate ¶¶1-185.

187.   Demand is excused because here plaintiffs identify specific grants, specific language in NVIDIA's option plans, specific public disclosures in NVIDIA's proxy statements and annual reports on Form 10-K, and supporting empirical analysis to allege knowing and purposeful violations of NVIDIA's shareholder plans and intentional fraudulent public disclosures.  Together, these facts provide sufficient particularity in the pleading of futility of demand to satisfy Rule 23.1's pre-suit demand requirement.

188.   As a result of the facts set forth herein, plaintiffs have not made any demand on the NVIDIA Board of Directors to institute this action against the defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

189.   The Board of Directors currently consists of eight directors: defendants Huang, Chu, Coxe, Gaither, Jones, Miller, Perry and Seawell – all of whom are defendants in this action.  Each of these defendants is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action for the following reasons, among others:

(a)    Huang, Coxe, Gaither, Jones, Miller and Seawell because, among other things, they are directly interested in the improperly backdated stock option grants complained of (*i.e.*, these six current directors each received improperly backdated stock options, including in the option grants represented to have been granted on June 18, 1999 and July 26, 2001), and Huang, Miller, Jones, Coxe and Gaither engaged in illegal insider selling in violation of their duty to abstain or disclose, including the exercise and sale of backdated options;

(b)    Coxe, Gaither and Jones, because as members of the Compensation Committee they directly participated in and approved the improper backdating of stock options, as alleged herein, and are substantially likely to be held liable for breaching their fiduciary duties.

1  Indeed as NVIDIA's Compensation Committee Charter notes, one of the Compensation

2  Committee's principal functions is to administer the Company's stock incentive plans.  Moreover, by

3  colluding with the officer defendants and others, as alleged herein, Coxe, Gaither and Jones have

4  demonstrated that they are unable or unwilling to act independently of the officer defendants;

5         (c)     Miller, Perry and Seawell, because as members of the Audit Committee they

6  directly participated in and approved the Company's violations of GAAP, as alleged herein, and are

7  substantially likely to be held liable for breaching their fiduciary duties.  Indeed NVIDIA touted in

8  its SEC filings that directors Miller, Seawell and Perry each qualifies as an "*audit committee*

9  *financial expert*."  Moreover, by colluding with the officer defendants and others, as alleged herein,

10  Miller, Perry and Seawell have demonstrated that they are unable or unwilling to act independently

11  of the officer defendants; and

12         (d)     All of the current directors, because as directors of the Company they directly

13  participated in and approved the Company's filing of false financial statements and other SEC

14  filings, as alleged herein, and are substantially likely to be held liable for breaching their fiduciary

15  duties.  Moreover, by colluding with the officer defendants and others, as alleged herein, all of the

16  current directors have demonstrated that they are unable or unwilling to act independently of the

17  officer defendants.

18         190.    The Compensation Committee of the Board of Directors is specifically responsible

19  under its Charter for reviewing and approving grants of stock options and other equity awards to

20  NVIDIA insiders.  This responsibility, although held by the Board, is delegated to the Compensation

21  Committee.  The Compensation Committee is currently comprised of defendants Coxe, Gaither and

22  Jones.  Defendants Coxe and Jones have been members of the Compensation Committee for at least

23  eight years.  Gaither has been a member for at least six years.  Thus, all of them served as

24  Compensation Committee members at the time backdated options were issued.  These defendants

25  were responsible as members of the Compensation Committee to review and approve stock options

26  granted to NVIDIA insiders during their respective tenures on the Committee.  Clearly, these

27  defendants did not fulfill this duty because they did not act to inform themselves of the

28  circumstances surrounding these option grants, thereby causing or allowing the Company's insiders

1  to obtain unreasonable and unreported compensation via the backdating of stock option grants.

2  Accordingly, there is a reasonable doubt that defendants Coxe, Gaither and Jones are disinterested

3  because they face a sufficiently substantial likelihood of liability for their breaches of fiduciary duty

4  to NVIDIA.  The Compensation Committee's decision to approve the options was not the product of

5  valid business judgment.  Thus, for this reason, as well, demand is futile as to Compensation

6  Committee members defendants Coxe, Gaither and Jones.

7       191.    The Audit Committee of the Board of Directors is responsible by its Charter for

8  reviewing and discussing: (i) NVIDIA's annual and quarterly financial statements; (ii) the

9  Company's accounting policies and the scope of audits; (iii) the effects of alternative GAAP

10  methods on financial statements; (iv) the Company's internal controls and any material issues

11  regarding them; (v) the Company's policies regarding risk assessment and risk management; and (vi)

12  procedures for receiving, retaining and handling complaints about accounting, internal controls and

13  other auditing matters.  These responsibilities, although held by the Board, are delegated to the Audit

14  Committee.  The Audit Committee is currently comprised of defendants Miller, Perry and Seawell.

15  Defendants Miller and Seawell have been members of the Audit Committee at least eight years.

16  Thus, these defendants were members of the Audit Committee both when backdated options were

17  granted, and throughout the time when the Company issued materially false and misleading financial

18  statements on account of the improper accounting for the backdated options.  Perry has been a

19  member at least one year.  These defendants were responsible as members of the Audit Committee

20  for insuring that NVIDIA's internal controls were adequate.  NVIDIA's internal controls, however,

21  were deficient as evidenced by its insiders' improper backdating of stock option grants and

22  announced restatement of financial information.  As a result of the improper backdating of stock

23  options, the Company's financials were rendered inaccurate because those financials did not account

24  for the true amount of compensation being granted to NVIDIA's insiders.  Accordingly, there is a

25  reasonable doubt that defendants Miller, Perry and Seawell are disinterested because they face a

26  sufficiently substantial likelihood of liability for their breaches of fiduciary duties owed to NVIDIA.

27  Thus, for this reason, as well, demand is futile as to Audit Committee member defendants Miller,

28  Perry and Seawell.

192.     The Nominating and Corporate Governance Committee of the Board of Directors (the "Corporate Governance Committee") is responsible under its Charter for: (i) recommending director nominees that the Company's stockholders elect; (ii) recommending nominees for each committee of the Board and for each committee chairmanship; (iii) reviewing, discussing and assessing the performance of the Board and its committees; and (iv) reviewing and discussing corporate-governance guidance and proposed changes to it.  These responsibilities, although held by the Board, are delegated to the Corporate Governance Committee.  The Corporate Governance Committee is currently composed of defendants Gaither, Coxe, Jones and Chu.  Gaither, Coxe and Jones have been members for at least four years.  Chu has been a member at least one year.  These defendants recommended that defendant Huang remain a NVIDIA director, despite his participation in backdating of stock option grants and his receipt of backdated options.  Because keeping Huang on the Board unnecessarily diluted the Board's ability to objectively examine accounting problems from Huang's tenure as President and CEO, and heightened Huang's ability to promote his self-interests in that regard, the Corporate Governance Committee did not exercise reasonable business judgment. The Corporate Governance Committee placed Huang's interests above those of the Company, and thus the Corporate Governance Committee breached its fiduciary duties.  Because the Corporate Governance Committee faces a sufficiently substantial likelihood of liability for its breaches of fiduciary duty, for this reason, as well, demand is futile as to Nominating and Corporate Governance Committee member defendants Gaither, Coxe, Jones and Chu.

193.     Additionally, because the entire Board of Directors approved the decision to maintain Huang as a director, President and CEO, demand is futile as to all Board members, including Huang, who accepted the Board position knowing of his participation in his backdating, his receipt of backdated options, and the related accounting problems over which he had presided.  Thus, for this reason, as well, demand is futile as to defendants Huang, Chu, Coxe, Gaither, Jones, Miller, Perry and Seawell.

194.     Defendant Huang is liable to NVIDIA for the undeserved compensation that he received as a result of the stock options that he backdated or otherwise manipulated.  Huang received 4,300,000 options that were dated at or very close to the lowest stock price for the month during

1  which options were granted.  Accordingly, on information and belief, plaintiffs allege that Huang

2  engineered, obtained and received backdated stock options and illegal compensation from NVIDIA.

3  Accordingly, there is a reasonable doubt that defendant Huang is disinterested because he faces a

4  sufficiently substantial likelihood of liability in connection with his improperly dated NVIDIA stock

5  options.  Defendant Huang also participated in the illegal insider selling (some of which included the

6  selling of stock acquired through the exercising of illegally backdated stock options).  Board member

7  defendant Huang sold thousands of his personally held shares for tens of millions of dollars in

8  proceeds while in possession of material, non-public information concerning the illegally

9  undisclosed backdating stock option grant practices.  Because Huang received a personal financial

10  benefit from the challenged insider trading transactions, he is interested.  Also, Huang faces a

11  sufficiently substantial likelihood of liability for breach of fiduciary duties for insider selling.  Since

12  Huang has breached his fiduciary duties and is interested, any demand upon him is futile.

13  195.    Defendant Seawell, by his specialized financial expertise, was in a unique position to

14  understand the business of NVIDIA, as well as its finances, markets, and present and future business

15  prospects.  Specifically, the Board has determined that Seawell qualifies as an "audit committee

16  financial expert" for the purposes of the SEC.  Seawell has a B.A. degree in Economics and an

17  M.B.A. degree in Finance from Stanford University.  Further, Seawell served as Senior Vice

18  President and CFO of Synopsys, Inc. from 1991-1997.  Due to his extensive financial background,

19  Seawell served as NVIDIA's interim CFO during the fourth quarter of the 1999 fiscal year.  Seawell,

20  because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of

21  NVIDIA's financials during at least eight years on the Audit Committee.  Nonetheless, defendant

22  Seawell breached his duties by causing or allowing the improper financials described herein.  As a

23  result of this defendant's breach of his duties, any demand upon him is futile.

24  196.    Defendant Miller, by his specialized financial expertise, was in a unique position to

25  understand the business of NVIDIA, as well as its finances, markets, and present and future business

26  prospects.  Specifically, the Board has determined that Miller qualifies as an "audit committee

27  financial expert" for the purposes of the SEC.  Miller has served as CEO and Chairman of the Board

28  of Avid Technology, Inc., and as CEO of Quantum Corporation.  Miller, because of his unique

1  qualifications, had a heightened duty to ensure the accuracy and fairness of NVIDIA's reported

2  compensation expenses during at least eight years on the Audit Committee.  Nonetheless, defendant

3  Miller breached his duties by causing or allowing the improper financials described herein.  As a

4  result of this defendant's breach of his duties, any demand upon him is futile.

5       197.   Defendant Perry, by his specialized financial expertise, was in a unique position to

6  understand the business of NVIDIA, as well as its finances, markets, and present and future business

7  prospects.  Specifically, the Board has determined that Perry qualifies as an "audit committee

8  financial expert" for the purposes of the SEC.  Perry has served as the senior business advisor for

9  Gilead Sciences, Inc., a biopharmaceutical company, reporting to Gilead's CEO.  Further, Perry is

10  also a board member of IntraBiotics, and the 2004 IntraBiotics proxy statement stated that Perry was

11  the chair of their audit committee and that the company considered Perry an "audit committee

12  financial expert."  Perry, because of his unique qualifications, had a heightened duty to ensure the

13  accuracy and fairness of NVIDIA's reported compensation expenses during at least one year on

14  NVIDIA's Audit Committee.  Nonetheless, defendant Perry breached his duties by causing or

15  allowing the improper financials described herein.  As a result of this defendant's breach of his

16  duties, any demand upon Perry is futile.

17       198.   Each of the defendants knew the adverse, non-public information regarding the

18  improper accounting as a result of their access to and review of internal corporate documents,

19  attendance at Board meetings, and conversations and connections with other corporate officers,

20  employees and directors.

21       199.   In addition, the principal professional occupation of defendant Huang is his

22  employment with NVIDIA, pursuant to which he received and continues to receive substantial

23  monetary compensations and other benefits.

24       200.   Accordingly, defendant Huang lacks independence from defendants Coxe, Gaither

25  and Jones, defendants who are not disinterested and/or independent and who exert influence over

26  defendant Huang's compensation by virtue of their positions as members of the Compensation

27  Committee.  The Compensation Committee has the authority to review and approve Huang's base

28

1   salary, bonus and equity compensation.  This lack of independence renders defendant Huang

2   incapable of impartially considering a demand to commence and vigorously prosecute this action.

3       201.    The entire NVIDIA Board of Directors and senior management participated in the

4   wrongs complained of herein.  NVIDIA's directors are not disinterested or independent due to the

5   following: defendants Huang, Coxe, Gaither, Jones, Miller and Seawell served on the NVIDIA

6   Board during the period in which Company executives were improperly backdating their stock

7   option grants.  Pursuant to their specific duties as Board members, each was charged with the

8   management of the Company and to conduct its business affairs.  Each of the above-referenced

9   defendants breached the fiduciary duties that they owed to NVIDIA and its shareholders in that they

10  failed to prevent and correct the improper stock option backdating practices.  Thus, the NVIDIA

11  Board cannot exercise independent objective judgment in deciding whether to bring this action or

12  whether to vigorously prosecute this action because its members are interested personally in the

13  outcome as it is their actions that have subjected NVIDIA to damages in the form of costs that the

14  Company must expend to restate its past financials and to investigate defendants' improprieties.

15      202.    Furthermore, demand is excused because the misconduct complained of herein was

16  not, and could not have been, an exercise of good faith business judgment.  It was not, and could not

17  be, an exercise of good faith business judgment for defendants to cause NVIDIA to: violate its own

18  stock option plans; issue false financial statements; issue false proxy statements; cause the Company

19  to file false tax returns; subject the Company to owe back taxes and penalties to the IRS; subject the

20  Company to potential federal securities law prosecutions; and pay extra compensation to its officers

21  and directors through the manipulative and concealed scheme asserted herein.  And, as stated above,

22  the backdating of options and related acts of false and fraudulent accounting or reporting for tax

23  purposes also have criminal implications.

24      203.    Here, where the entire Board of Directors is comprised of experienced executives

25  with years of financial expertise, there is little doubt as to the Board members knowledge of

26  impropriety.  The odds of NVIDIA stock price increasing exponentially almost each and every time

27  in the two-week period following stock option grants, and experienced industry veterans failing to

28  recognize the amazing and alarming pattern, are long.  A *Wall Street Journal* analysis following

1  options grants made by another company under similar circumstances, suggested that the odds of the

2  fortuitous stock price increase following each grant was extraordinarily remote – around 1 in 300

3  billion, while the odds of winning the multistate Powerball lottery with a $1 ticket is 1 in 146

4  million.

5        204.    Given these odds, it defies reason that the Board members with years of financial

6  experience and training would fail to recognize this pattern year after year in grants not only given to

7  their associates, but to themselves as well.  Where illegal conduct occurs over a period of years and

8  the Board is not only is aware of but participates in it for a substantial period of time without taking

9  any action, demand futility is presumed.  *See In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d

10  795, 808 (7th Cir. 2003) (in finding demand excused court noted that given the extensive trail

11  concerning the violations of federal regulations and inferred awareness of the problems the acts

12  supported a reasonable assumption that there was a sustained and systematic failure of the board to

13  exercise oversight in that the directors knew of the violations of law, took no steps in an effort to

14  prevent or remedy the situation, and that failure to take any action for such an inordinate amount of

15  time resulted in substantial corporate losses and establishing a lack of good faith, "***continuing***

16  ***violations of federal regulations over a period of six years cannot be minimized***"); *In re Veeco*

17  *Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) ("If true, plaintiffs

18  allegations that the Committee failed to exercise appropriate attention to potentially illegal corporate

19  activities would constitute a breach of loyalty, subjecting [listing several defendants] to a substantial

20  likelihood of liability.  Thus, plaintiffs' allegations raise a reasonable doubt that these director-

21  Committee members were disinterested and capable objectively deciding whether or not to prosecute

22  this litigation on the corporation's behalf.").

23        205.    In order to bring this suit, all of the directors of NVIDIA would be forced to sue

24  themselves and persons with whom they have extensive personal and business entanglements.

25  Specifically, defendants Coxe and Gaither are Managing Directors of Sutter Hill Ventures, a venture

26  capital investment firm which was an investor in NVIDIA before the Company went public and

27  continues to be an investor of NVIDIA.  Because of the relationship involving Sutter Hill Ventures

28  and NVIDIA, and specifically because of Sutter Hill Ventures' investment in NVIDIA, defendants

1    Coxe and Gaither would not want NVIDIA's stock price to plummet as the result of a protracted

2    investigation and the Company's admission of liability in the alleged backdating scheme.  Further,

3    because of their personal and business relationship, defendants Coxe and Gaither lack the

4    independence necessary to impartially consider a demand to commence and vigorously prosecute an

5    action based on the wrongdoing alleged herein.  Therefore, demand is futile with respect to

6    defendants Coxe and Gaither.

7           206.   Defendant Chu is also beholden to the other directors and NVIDIA management such

8    that he lacks the independence necessary to impartially consider a demand.  Defendant Chu is a

9    Professor of Physics and Professor of Molecular and Cellular Biology at the University of California,

10   Berkley (the "University").   NVIDIA has been a prolific corporate contributor to Dr. Chu's

11   employer, the University, which together with other corporate entities donated over $10.5 million in

12   2004.  NVIDIA has also funded research for defendant Chu's fellow Berkley professor and

13   colleague, Dr. Geoffrey Marcy, to the tune of almost $200,000.  Additionally defendant Chu is also a

14   board member, along with fellow defendant James C. Gaither, at the William and Flora Hewlett

15   Foundation.  Defendant Chu cannot be reasonably expected to consider demand against his fellow

16   directors given the ties between NVIDIA and his employer and his personal and social ties with

17   defendant Gaither.  *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003)

18   ("To be direct, corporate directors and generally the sort of people deeply enmeshed in social

19   institutions.  Such institutions have norms, expectations that, explicitly and implicitly, influence and

20   channel the behavior of those who participate in their operation.").

21          207.   Defendant Seawell likewise cannot impartially consider a demand.  In addition to the

22   other reasons stated above, defendant Seawell is a venture partner with New Enterprise Associates

23   ("NEA"), a venture capital investment firm.  Among NEA's portfolio companies is Myogen, Inc.

24   Myogen, Inc., was recently acquired in a $2.5 billion deal with Gilead Sciences, which was

25   announced soon after plaintiffs filed their complaint in the instant action.  Defendant Perry is a

26   senior business advisor of Gilead Sciences where he advises senior management and the board of

1    directors on corporate development, marketing, investment relations and strategic initiatives.  As

2    such, he would have been a key player in Gilead's acquisition of Myogen, which has greatly

3    benefited NEA, in which defendant Seawell is a partner.  Given this acquisition of historic

4    proportions, which benefited NEA, defendant Seawell's employer, defendant Seawell in no way

5    would jeopardize or malign defendant Perry.  Given the interconnecting ties between defendants

6    Seawell and Perry, defendant Seawell is unable to properly and independently consider a demand.

7         208.    Additionally, defendant Gaither is retired from the law firm of Cooley Godward, LLP

8    ("Cooley"), where he was a Partner from 1971 until 2000 and served as Senior Counsel from 2000 to

9    2003.  In 2002, Cooley conducted an independent review, in conjunction with an accounting firm, of

10   certain of NVIDIA's financial transactions.  Gaither lacks the independence necessary to impartially

11   consider a demand to prosecute an action based on the wrongdoing alleged herein because such an

12   investigation would likely uncover glaring omissions in Cooley's investigation from 2002, and

13   Cooley's failure to take proper proactive measures at that time.  Moreover, Cooley represents many

14   such companies and/or their directors in other stock option backdating litigation.  Therefore, for this

15   additional reason, demand is futile with respect to defendant Gaither.

16        209.    Defendants Gaither and Perry's relationship also prevent them from being able to

17   independently and impartially consider demand.  Like defendant Gaither, defendant Perry was also a

18   Partner in the Cooley law firm, where he worked for many years.  In fact, defendant Perry worked

19   alongside defendant Gaither in the firm's San Francisco office where both defendants, as partners in

20   the firm, specialized in corporate and securities law.  Given this relationship of working not only for

21   the same firm, but in the same office specializing in the same practice of law, defendants Gaither and

22   Perry cannot act, and would not have acted, impartiality if a demand had been presented.  As such,

23   demand is futile as to both defendants Gaither and Perry.  *See Oracle*, 824 A.2d at 938-39

24   ("[b]eholden . . . can also flow out of 'personal or other relationships' to the interested party").

25        210.    Defendant Jones is also a director of Wind River Systems, Inc., which is engaged in

26   an internal review of the company's historical stock option granting practices and related accounting.

27   Jones is one member of a two member special subcommittee of Wind River's audit committee to

28   lead the internal review of its historical stock option grants.  Therefore, Jones' reputation and his

position as a director at Wind River, where he just joined the board in 2004, would be severely damaged if there was any hint of impropriety at NVIDIA, where he has been a director since 1993, given his unique position as a so-called "independent investigator" pertaining to stock options backdating at Wind River.   Therefore, demand upon Jones is futile because Jones lacks the independence necessary to impartially consider a demand on NVIDIA's Board of Directors.

211.   Additionally, and without prejudice to the foregoing, no demand upon the Board of Directors is required with respect to claims asserted arising from the filing or issuance of misleading proxy statements by defendants, as more fully discussed herein.

### FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duties

212.   Plaintiffs incorporate ¶¶1-211.

213.   Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

214.   More specifically, defendants breached their fiduciary duties by: (a) colluding with the defendants on the Compensation Committee to backdate stock option grants; (b) colluding with the defendants on the Audit Committee to violate GAAP and Section 162(m); (c) colluding with the other defendants to produce and disseminate to NVIDIA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and (d) colluding with the other defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

215.   Defendants' misconduct was not, and could not have been, an exercise of good faith business judgment.   Rather, it was intended to, and did, unduly benefit defendants at the expense of the Company.

216.   The defendants who served on the Compensation Committee (Coxe, Gaither and Jones) breached their fiduciary duties by: (a) colluding with the officer defendants to backdate stock option grants; (b) colluding with the defendants who served on the Audit Committee (Miller, Perry and Seawell) to violate GAAP and Section 162(m); (c) colluding with the other defendants to

1   produce and disseminate to NVIDIA shareholders and the market false financial statements that

2   improperly recorded and accounted for the backdated option grants and concealed the improper

3   backdating of stock options; and (d) colluding with the other defendants to file false proxy

4   statements and false Form 4 filings in order to conceal the improper backdating of stock options.

5   217.   These defendants' misconduct was not, and could not have been, an exercise of good

6   faith business judgment.  Rather, it was intended to, and did, unduly benefit the defendants at the

7   expense of the Company.

8   218.   As alleged in detail herein, defendants who served on the Audit Committee breached

9   their fiduciary duties by: (a) colluding with the other defendants to violate GAAP and Section

10  162(m); (b) colluding with the other defendants to produce and disseminate to NVIDIA shareholders

11  and the market false financial statements that improperly recorded and accounted for the backdated

12  option grants and concealed the improper backdating of stock options; and (c) colluding with the

13  other defendants to file false proxy statements and false annual reports on Form 10-K in order to

14  conceal the improper backdating of stock options.

15  219.   These defendants' foregoing misconduct was not, and could not have been, an

16  exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the

17  NVIDIA's top executives at the expense of the Company.

18  220.   As a direct and proximate result of defendants' foregoing breaches of fiduciary duties,

19  the Company has sustained millions of dollars in damages, including, but not limited to, the

20  additional compensation expenses and tax liabilities the Company was required to incur and loss of

21  funds paid to the Company upon exercise of options.

22  **SECOND CAUSE OF ACTION**

23  **(Against All Defendants for Violations of §14(a) of the Exchange Act)**

24  221.   Plaintiffs incorporate ¶¶1-211.

25  222.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

26  proxy statement shall contain "any statement which, at the time and in the light of the circumstances

27  under which it is made, is false or misleading with respect to any material fact, or which omits to

28

1    state any material fact necessary in order to make the statements therein not false or misleading." 17

2    C.F.R. §240.14a-9(a).

3        223.    NVIDIA's Definitive Proxy Statements, including the statements issued on May 26,

4    2000, June 8, 2000, June 25, 2001, May 28, 2002, and May 20, 2003, violated §14(a) and Rule 14a-9

5    because they omitted material facts, including the fact that certain of the defendants were causing

6    NVIDIA to engage in an option backdating scheme, a fact of which the defendants were aware and

7    participated in from at least 1999 and further misrepresented that NVIDIA options were granted to

8    Company executives and directors at an exercise price equal to the market price of NVIDIA stock on

9    the date the stock options were granted. Certain of the Proxy Statements were further false and

10    misleading with respect to their representations concerning the tax implications of the stock option

11    grants.

12        224.    In the exercise of reasonable care, defendants should have known that the Proxy

13    Statements were materially false and misleading.

14        225.    The misrepresentations and omissions in the Proxy Statements were material to

15    shareholders in voting on each Proxy Statement. The Proxy Statements were an essential link in the

16    accomplishment of the continuation of defendants' unlawful stock options backdating scheme, as

17    revelations of the truth would have immediately thwarted a continuation of shareholders'

18    endorsement of the directors' positions, the executive officers' compensation and the Company's

19    compensation policies.

20        226.    The Company was damaged as a result of the material misrepresentations and

21    omissions in the Proxy Statements.

22                             **THIRD CAUSE OF ACTION**

23                **(Against All Defendants for Breach of Fiduciary Duties**
                 **Relating to the Filing of False Financial Statements with the SEC)**

24

25        227.    Plaintiffs incorporate ¶¶1-211.

26        228.    Each of the defendants intentionally or recklessly employed devices, schemes, and

27    artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud

28    and deceit upon the Company.

1    229.    The Company relied upon defendants' fraud in granting certain of the other

2    defendants options to purchase shares of NVIDIA common stock.

3    230.    As a direct and proximate result of defendants' fraud the Company has sustained

4    millions of dollars in damages, including, but not limited to, the additional compensation expenses

5    and tax liabilities the Company was required to incur and loss of funds paid to the Company upon

6    exercise of options.

7    **FOURTH CAUSE OF ACTION**

8    **(Against All Defendants for Unjust Enrichment)**

9    231.    Plaintiffs incorporate ¶¶1-211.

10    232.    Defendants were unjustly enriched by their receipt and retention of backdated stock

11    option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits

12    thereof.

13    233.    To remedy defendants' unjust enrichment, this Honorable Court should order them to

14    disgorge to the Company all of the backdated stock options they received, including the proceeds of

15    any such options that have been exercised, sold, pledged or otherwise monetized.

16    **FIFTH CAUSE OF ACTION**

17    **(Against All Defendants for Abuse of Control)**

18    234.    Plaintiffs incorporate ¶¶1-211.

19    235.    Defendants employed the alleged scheme for the purpose of maintaining and

20    entrenching themselves in their positions of power, prestige and profit at, and control over, NVIDIA,

21    and to continue to receive the substantial benefits, salaries and emoluments associated with their

22    positions at the Company.  As a part of this scheme, defendants actively made and/or participated in

23    the making of, or aided and abetted the making of, misrepresentations regarding NVIDIA.

24    236.    Defendants' conduct constituted an abuse of their ability to control and influence

25    NVIDIA.

26    237.    By reason of the foregoing, the Company has been damaged.

27

28

**SIXTH CAUSE OF ACTION**

**(Against All Defendants for Gross Mismanagement)**

238.    Plaintiffs incorporate ¶¶1-211.

239.    Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure control of NVIDIA.

240.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of NVIDIA in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

241.    During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused NVIDIA to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to NVIDIA, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged NVIDIA.

242.    By reason of the foregoing, the Company has been damaged.

**SEVENTH CAUSE OF ACTION**

**(Against All Defendants for Constructive Fraud)**

243.    Plaintiffs incorporate ¶¶1-211.

244.    As corporate fiduciaries, defendants owed to NVIDIA and its shareholders a duty of candor and full accurate disclosure regarding the true state of NVIDIA's business and assets and their conduct with regard thereto.

245.    As a result of the conduct complained of, defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from NVIDIA's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of NVIDIA.  Thus, they have committed constructive fraud and violated their duty of candor.

246.    By reason of the foregoing, the Company has been damaged.

**EIGHTH CAUSE OF ACTION**

**(Against All Defendants for Corporate Waste)**

247.    Plaintiffs incorporate ¶¶1-211.

248.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to defendants via the option backdating scheme, defendants have caused NVIDIA to waste valuable corporate assets.

249.    As a result of defendants' corporate waste, they are liable to the Company.

**NINTH CAUSE OF ACTION**

**(Against Defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)**

250.    Plaintiffs incorporate ¶¶1-211.

251.    At the time of the stock sales set forth herein, defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller knew the information described above, and sold NVIDIA common stock on the basis of such information.

252.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller used for their own benefit when they sold NVIDIA common stock.

253.    At the time of their stock sales, defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses.  Defendants' sales of NVIDIA common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

1    254.    Since the use of the Company's proprietary information for their own gain constitutes

2    a breach of defendant's fiduciary duties, the Company is entitled to the imposition of a constructive

3    that on any profits defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg,

4    Seawell, Malachowsky, Gaither, Jones and Miller obtained thereby.

5                            **TENTH CAUSE OF ACTION**

6    **(Against Defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg,**
     **Seawell, Malachowsky, Gaither, Jones and Miller for Violation of**
7                       **California Corporations Code §25402)**

8    255.    Plaintiffs incorporate ¶¶1-211.

9    256.    At the time that defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe,

10   Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller sold their NVIDIA common stock as set

11   forth herein, by reason of their high executive and/or directorship positions with NVIDIA,

12   defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky,

13   Gaither, Jones and Miller had access to highly material information regarding the Company,

14   including the information set forth herein regarding the true adverse facts concerning defendants'

15   backdating practices.

16   257.    Further, defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg,

17   Seawell, Malachowsky, Gaither, Jones and Miller cashed in their illegally backdated stock options

18   and sold them for millions in proceeds.

19   258.    At the time of such sales, that information was not generally available to the public or

20   the securities markets. Had such information been generally available, it would have significantly

21   reduced the market price of NVIDIA shares at that time.

22   259.    Defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell,

23   Malachowsky, Gaither, Jones and Miller, and each of them, had actual knowledge of material,

24   adverse, non-public information and thus sold their NVIDIA common stock in California in

25   violation of California Corporations Code §25402.

26   260.    Pursuant to California Corporations Code §25502.5, defendants Huang, Shannon,

27   Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller,

28   and each of them, are liable to NVIDIA for damages in an amount up to three times the difference

between the price at which NVIDIA common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## ELEVENTH CAUSE OF ACTION

**(Against Defendants Huang, Coxe, Gaither, Jones, Miller, Perry,
Seawell, Stevens and Chu for Violation of California Corporations Code §25403)**

261.    Plaintiffs incorporate ¶¶1-211.

262.    These defendants, through their positions on NVIDIA's Board of Directors, possessed control and influence over defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller's sale of NVIDIA common stock in violation of the California Corporations Code.  These defendants are also liable to the same extent as defendants under California Corporations Code §25403.

263.    These defendants were aware of defendants' knowledge of the material, adverse, non-public information and these defendants were aware of defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller's intent to sell NVIDIA common stock while in possession of the material, adverse, non-public information.

264.    These defendants are culpable for defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller's underlying violations of California Corporations Code §25402 because of their knowledge and ability to control and influence defendants Huang, Shannon, Priem, Stevens, Vivoli, Fischer, Coxe, Hoberg, Seawell, Malachowsky, Gaither, Jones and Miller and because their involvement in preparing and/or approving financials that improperly accounted for the Company's compensation expenses related to grants of stock options to NVIDIA officers, directors and employees.

265.    Under California Corporations Code §25403, these defendants, and each of them, are liable to NVIDIA for damages in an amount up to three times the difference between the price at which NVIDIA common stock would have had sold for at the time of the sale if the information known to defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**TWELFTH CAUSE OF ACTION**

**(Against Defendants Huang and Burkett for Disgorgement
under the Sarbanes-Oxley Act of 2002)**

266.    Plaintiffs incorporate ¶¶1-211.

267.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepared an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

> (a)    ADDITIONAL COMPENSATION PRIOR TO NONCOMPLIANCE WITH COMMISSION FINANCIAL REPORTING REQUIREMENTS. – If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive offer and chief financial officer of the issuer shall reimburse the issuer for –
>
> (1)    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2)    any profits realized from the sale of securities of the issuer during that 12-month period.
>
> (b)    COMMISSION EXEMPTION AUTHORITY. – The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

268.    NVIDIA will restate financial statements due to material non-compliance of such statements with federal securities laws reporting requirements.  These restatements resulted from "misconduct" within the meaning of Section 304 of the Sarbanes-Oxley Act of 2002.  As a result, defendant Huang, as NVIDIA's CEO, and defendant Burkett, as NVIDIA's CFO, are required to reimburse NVIDIA for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002) through the present.

269.    Further, defendants Huang and Burkett also are liable to NVIDIA for any profits realized from the sales of securities by the Company during the same period of time.

270.    Defendants Huang and Burkett are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of NVIDIA.

## THIRTEENTH CAUSE OF ACTION

**(Against Defendants Huang, Fisher, Malachowsky, Hoberg, Priem, Coxe, Gaither, Jones, Miller, Seawell and Stevens for Rescission)**

271.    Plaintiffs incorporate ¶¶1-211.

272.    As a result of the acts alleged herein, the stock option contracts between these defendants and NVIDIA entered into during the relevant period were obtained through defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid because defendants authorized these options in breach of the terms of the publicly-filed contracts regarding the defendants' employment agreements and the Company's stock option plans.

273.    All contracts which provide for stock option grants between these defendants and NVIDIA and were entered into during times relevant hereto should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## FOURTEENTH CAUSE OF ACTION

**(Against All Defendants for Constructive Trust)**

274.    Plaintiffs incorporate ¶¶1-211.

275.    As a result of the acts alleged herein, defendants authorized the grant of backdated or otherwise manipulated equity-based compensation to themselves and other NVIDIA insiders.  In effect, these backdated options and other manipulated equity or incentive based compensation constitutes illegal compensation in violation of NVIDIA's stock option plans and other compensation policies.

276.    The Company has a right for the return of this compensation because it was illegally authorized by defendants and paid out of the Company's assets.

277.    Defendants and other NVIDIA insiders profited from the illegally backdated options by wrongful acts.

278.     Accordingly, plaintiffs seek a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

**FIFTEENTH CAUSE OF ACTION**

**(Against Defendants Huang, Burkett, Coxe, Gaither, Jones, Miller,
Perry, Seawell, Stevens and Chu for Violation of §10(b) of the
Exchange Act and Rule 10b-5 Promulgated Thereunder)**

279.     Plaintiffs incorporate ¶¶1-211.

280.     Between at least 1999 and the present, defendants Huang, Burkett, Coxe, Gaither, Jones, Miller, Perry, Seawell, Stevens and Chu disseminated or approved financial statements that did not disclose the backdating practices that were occurring at NVIDIA and the resulting effects of those practices on the Company's financial results.  Specifically, NVIDIA's financial statements, as identified above, included financial results that did not properly account for stock options that were granted below fair market value as required under GAAP.  Defendants Huang, Burkett, Coxe, Gaither, Jones, Miller, Perry, Seawell, Stevens and Chu knew or recklessly disregarded the fact that the Company's financial statements were misleading – due to the backdating – in that the financial statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

281.     At the same time the price of the Company's common stock was inflated due to the improperly accounted for stock options and defendants were selling stock into the market, defendants Huang, Burkett, Coxe, Gaither, Jones, Miller, Perry, Seawell, Stevens and Chu were causing NVIDIA to repurchase its own stock on the open market at inflated prices from August 2004 through the present.  Thus, defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

1       (b)     made untrue statements of material facts of omitted to state material facts

2 necessary in order to make the statements made, in light of the circumstances under which they were

3 made, not misleading; or

4       (c)     engaged in acts, practices and a course of business that operated as a fraud or

5 deceit upon NVIDIA and others in connection with their purchases of NVIDIA common stock

6 during the relevant period.

7      282.   As a result of the misconduct by defendants Huang, Burkett, Coxe, Gaither, Jones,

8 Miller, Perry, Seawell, Stevens and Chu, NVIDIA has and will suffer damages in that it paid

9 artificially inflated prices for NVIDIA common stock purchased on the open market.  NVIDIA

10 would not have purchased NVIDIA common stock at the prices it paid, had the market previously

11 been aware that the market price of NVIDIA's stock was artificially and falsely inflated by

12 defendants' misleading statements.  As a direct and proximate result of these defendants' wrongful

13 conduct, NVIDIA suffered damages in connection with its purchases of NVIDIA common stock.  By

14 reason of such conduct, defendants Huang, Burkett, Coxe, Gaither, Jones, Miller, Perry, Seawell,

15 Stevens and Chu are liable to the Company pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5

16 promulgated thereunder.

17 **PRAYER FOR RELIEF**

18    WHEREFORE, plaintiffs demand judgment as follows:

19    A.    Awarding money damages against all defendants, jointly and severally, for all losses

20 and damages suffered as a result of the acts and transactions complained of herein, together with pre-

21 judgment interest, to ensure defendants do not participate therein or benefit thereby;

22    B.    Directing all defendants to account for all damages caused by them and all profits and

23 special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

24 including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and

25 imposing a constructive trust thereon;

26    C.    Directing NVIDIA to take all necessary actions to reform and improve its corporate

27 governance and internal control procedures to comply with applicable law, including, but not limited

28 to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or

1   Articles of Incorporation and taking such other action as may be necessary to place before

2   shareholders for a vote adoption of the following Corporate Governance policies:

3           (a)    a proposal requiring that the office of CEO of NVIDIA and Chairman of the

4   NVIDIA Board of Directors be permanently held by separate individuals and that the Chairman of

5   the NVIDIA Board meet rigorous "independent" standards;

6           (b)    a proposal to strengthen the NVIDIA Board's supervision of operations and

7   develop and implement procedures for greater shareholder input into the policies and guidelines of

8   the Board;

9           (c)    appropriately test and then strengthen the internal audit and control functions;

10          (d)    rotate independent auditing firms every five years;

11          (e)    control and limit insider stock selling and the terms and timing of stock option

12   grants; and

13          (f)    reform executive compensation;

14     D.    Ordering the imposition of a constructive trust over defendants' stock options and any

15   proceeds derived therefrom;

16     E.    Awarding punitive damages;

17     F.    Awarding costs and disbursements in this action, including reasonable attorneys',

18   accountants', and experts' fees; and

19     G.    Granting such other and further relief as this Court may deem just and proper.

20                       **JURY DEMAND**

21     Plaintiffs demand a trial by jury.

22   DATED:  February 28, 2007          LERACH COUGHLIN STOIA GELLER

                                      RUDMAN & ROBBINS LLP

23                          SHAWN A. WILLIAMS

                         MONIQUE C. WINKLER

24                          AELISH M. BAIG

25

26                                 s/ Shawn A. Williams

                            SHAWN A. WILLIAMS

27

28

CONSOLIDATED VERIFIED SHAREHOLDERS DERIVATIVE  COMPLAINT - C-06-06110-SBA     - 86 -

1                            100 Pine Street, Suite 2600

2                            San Francisco, CA  94111
                             Telephone:  415/288-4545

3                            415/288-4534 (fax)

4                            LERACH COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP

5                            TRAVIS E. DOWNS III
                             BENNY C. GOODMAN III

6                            MARY LYNNE CALKINS
                             655 West Broadway, Suite 1900

7                            San Diego, CA  92101
                             Telephone:  619/231-1058

8                            619/231-7423 (fax)

9                            LERACH COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP

10                           THOMAS G. WILHELM
                             9601 Wilshire Blvd., Suite 510

11                           Los Angeles, CA  90210
                             Telephone:  310/859-3100

12                           310/278-2148 (fax)

13       *I, Shawn A. Williams, am the ECF User whose ID and password are being used to file this Consolidated Verified Shareholders Derivative Complaint.  In compliance with General Order 45,*

14  *X.B., I hereby attest that Stephen R. Basser have concurred in this filing.*

15  DATED:  February 28, 2007           BARRACK, RODOS & BACINE
                             STEPHEN R. BASSER

16                           JOHN L. HAEUSSLER

17

18                                 s/ Stephen R. Basser
                               STEPHEN R. BASSER

19

20                           402 West Broadway, Suite 850
                             San Diego, CA  92101

21                           Telephone:  619/230-0800
                             619/230-1874 (fax)

22                           BARRACK, RODOS & BACINE
                             DANIEL BACINE

23                           JEFFREY W. GOLAN
                             CHAD A. CARDER

24                           3300 Two Commerce Square
                             2001 Market Street

25                           Philadelphia, PA  19103
                             Telephone:  215/963-0600

26                           215/963-0838 (fax)

27                           Co-Lead Counsel for Plaintiffs

S:\CasesSD\NVIDIA Derv\Consol Verified Derv Cpt.doc

28

1

## VERIFICATION

2

3       I, TRAVIS E. DOWNS III, hereby declare as follows:

4       1.      I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins,

5   LLP, one of the Lead Counsel for Lead Plaintiffs in the above-entitled action.  I have read the

6   foregoing Consolidated Verified Shareholders Derivative Complaint and know the contents thereof.

7   I am informed and believe the matters therein are true and on that ground allege that the matters

8   stated therein are true.

9       2.      I make this Verification because plaintiffs are absent from the County of San Diego

10  where I maintain my office.

11      Executed this 28th day of February, 2006 at San Diego, California.

12

13                                          _____s/ Travis E. Downs III_____

14                                               TRAVIS E. DOWNS III

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2   I hereby certify that on February 28, 2007, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7

8                s/ Shawn A. Williams
                 SHAWN A. WILLIAMS

9                 LERACH COUGHLIN STOIA GELLER
                   RUDMAN & ROBBINS LLP

10               100 Pine Street, 26th Floor

11               San Francisco, CA  94111
               Telephone:  415/288-4545

12               415/288-4534 (fax)

13               E-mail: swilliams@lerachlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:06-cv-06110-SBA

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Travis E. Downs, III**
  travisd@lerachlaw.com e_file_sd@lerachlaw.com

- **Richard Gallagher**
  rgallagher@orrick.com gpackard@orrick.com

- **Christopher T. Heffelfinger**
  cheffelfinger@bermanesq.com

- **Joseph C. Kohn**
  jkohn@kohnswift.com

- **Nicole Lavallee**
  nlavallee@bermanesq.com

- **Betsy C. Manifold**
  manifold@whafh.com

- **Denis Francis Sheils**
  dsheils@kohnswift.com

- **Joseph J. Tabacco, Jr**
  jtabacco@bermanesq.com

- **Shawn A. Williams**
  shawnw@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;aelishb@lerachlaw.com;moniquew@lerachla

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
William E. Hoese
Kohn Swift & Graf PC
One South Broad Street
Suite 2100
Philadelphia, PA 19107
```