DECLARATION OF PROFESSOR JESSE M. FRIED
IN SUPPORT OF DERIVATIVE SETTLEMENT

*In re NVIDIA CORP. DERIVATIVE LITIGATION*

I, Jesse M. Fried, under penalty of perjury as provided by law, declare that the statements set forth in this instrument are true and correct.

Plaintiffs' Counsel, *Barrack, Rodos & Bacine, The Shuman Law Firm, and Robbins Umeda LLP*, has asked me to review the proposed settlement in the above-captioned matter and assess whether the executive compensation and corporate governance measures (hereinafter, "measures") implemented through the settlement provide substantial benefits to NVIDIA Corporation ("NVIDIA" or the "Company") and its shareholders. For the reasons discussed more fully below, my opinion is that these measures do indeed provide substantial benefits to NVIDIA and its shareholders.[1]

## Personal Background and Qualifications

1. I am a Professor of Law at the UC Berkeley School of Law, where I have taught since 1997. Since 2005, I have also been faculty co-director of the Berkeley Center for Law, Business, and the Economy (BCLBE). I was the Nathaniel Fensterstock Visiting Professor of Law at Columbia University in 2007 and the Robert and Candice Haas Visiting Professor of Law at Harvard University in 2008. A copy of my curriculum vitae is attached hereto as

---

[1] My opinion is based a review of the terms of the settlement and certain materials relating to NVIDIA's existing governance arrangements as well as various litigation documents. I have not made any independent factual investigation into the actions of NVIDIA's officers and directors before or after the commencement of the litigation, the merits of Plaintiffs' case, or the circumstances surrounding the settlement.

- 1 -

Appendix A.  My specialties include the fields of executive compensation, insider trading, and corporate governance. My work on these subjects has been published in a variety of law journals, including the California Law Review, University of Chicago Law Review, and the Yale Law Journal. I am the author of a widely-cited book on executive pay and corporate governance, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation*, Harvard University Press 2004 (co-authored with Professor Lucian Bebchuk). These publications can be found on my *curriculum vitae*. I also regularly teach courses and seminars in these areas.

### The Proposed Settlement

2. The settlement follows the filing of a shareholders' derivative lawsuit by plaintiffs alleging "option backdating" by NVIDIA.  The settlement implements numerous measures to NVIDIA's executive compensation practices and corporate governance arrangements.[2]  Many of these measures are designed to prevent a repetition of the option backdating alleged in the complaint.  However, quite a few measures are aimed at improving executive compensation and corporate governance more generally at NVIDIA, and these more general measures are likely to have important effects on NVIDIA that go beyond the prevention of option backdating.

---

[2] These measures are set out in the Corporate Governance Term Sheet attached as Exhibit A to the Stipulation and Agreement of Settlement of Derivative Action ("Stipulation"), and are referred to in the Stipulation as "Corporate Governance Policies and Changes."

3.  I will not attempt to summarize all of these measures here. Rather, I will focus on what I see as the most important measures, and evaluate the likely effects of their implementation on NVIDIA and its shareholders. In doing so, I will address whether these measures, if implemented diligently and in good faith, provide substantial benefits to NVIDIA and its shareholders.[3]

4.  In my view, the measures will confer substantial benefits on NVIDIA and its shareholders by (1) preventing executives from backdating their own and other employees' stock options; (2) significantly reducing the likelihood that NVIDIA's executives will manipulate earnings; and, (3) even more importantly, making Nvidia's Board of Directors ("the Board") a more effective representative of public shareholders. Collectively, these measures can be expected to have a meaningful effect on NVIDIA's stock price. Below, I describe each of the three benefits and their likely effect on the stock price.

**Eliminating Future Option Backdating**

5.  Before explaining how the measures will prevent the backdating of executives' and other employees' options, I will describe the practice of option backdating, explain why executives (of NVIDIA and other public companies) may have an incentive to engage in the backdating of their own and other employees' options, and discuss how both types of option backdating hurt public investors.

---

[3] For purposes of this opinion, I am assuming, as the parties have stipulated, that the efforts of Plaintiffs' Counsel were a material factor in NVIDIA's adopting or agreeing to adopt these measures.

6. *Option Backdating:* An employee stock option gives the employee a right to buy stock in the employee's company from the company at some point in the future by paying the option's "exercise" price. The lower the exercise price, the more likely it is that the option can be exercised profitably and the larger the profit will be. A lower exercise price thus benefits the recipient employee at the expense of the company. In almost all employee options, the exercise price is "at-the-money:" it is set to the market price on the grant date of the option.

7. Public companies are permitted to offer "in-the-money" options, options whose exercise price is set below the grant-date market price (and which are thus more valuable to the employee and more costly to the company than at-the-money options). However, such options are rarely given to employees, for three reasons. First, in-the-money options are not considered "performance-based compensation" under Section 162(m) of the Internal Revenue Code. Thus, they are not deductible if given to an executive whose total non-performance-based compensation (including salary) exceeds $1 million per year. In contrast, at-the-money options are considered "performance-based compensation" and therefore are always deductible. Second, a grant of in-the-money options has a more negative impact on reported earnings than a grant of those same options at-the-money options. Third, institutional investors view in-the-money options as insufficiently performance-sensitive: recipients can profit even if the stock price does not increase over the life of the option. Thus, such investors

have exerted pressure on publicly-traded firms not to grant such options to their employees.

8. Option backdating involves falsifying the grant date in order to offer the recipient a lower-priced (and thus more valuable) "in-the-money" option disguised as an "at-the-money" option. In particular, those granting stock options pick a day when the stock price was much lower than the stock price on the actual grant date, pretend that the options were granted on that hindsight-chosen date, and then set the option exercise price to that date's low price. The resulting option appears to be "at-the-money," but is actually an "in-the-money" option on the true grant date. As I explain below, executives have various incentives to backdate both their own options as well as the options of other employees.

9. *Incentives to Backdate Executives' Options.* Executives have two incentives to backdate their own options. First, backdating these options boosts executives' pay: lowering the strike price, as I explained earlier, makes each option more valuable. Studies of backdating have determined that, on average, backdating CEOs' options boosted CEO option pay by about 20%.[4]

10. Second, while increasing the value of an executive's option compensation, backdating the executive's options actually enables the company to report a lower amount of executive compensation to shareholders and regulators.[5] For example, backdating might boost pay $5 million (from $20 million to $25 million) while at the same time enabling the company to

---

[4] See Lucian Bebchuk et al, Lucky CEOs (working paper, 2006).

[5] See Jesse M. Fried, Option Backdating and Its Implications, 65 Washington & Lee L. Rev. 853 (2008).

report $2 million less in compensation ($18 million rather than $20 million or the actual $25 million). This camouflaging of compensation, in turn, reduces the possibility that the firm's executives and directors will be the target of discomforting media and shareholder "outrage," one of the key constraints on executive pay. [6]

11. *Incentives to Backdate Other Employees' Options.* Executives can also benefit by secretly backdating non-executive employees' options. First, the secret backdating of employee option grants inflates reported earnings by enabling firms to give employees in-the-money options while treating them for accounting purposes as less expensive at-the-money options. The bulk of executives' cash compensation comes in the form of short and long-term bonuses and incentive compensation plans that, in turn, are heavily tied to reported earnings. Thus, the backdating of non-executive employees' options can increase payouts from these components of executives' compensation packages.

12. Second, executives frequently sell shares in their firms, and the price at which they can unload their stock usually depends on reported earnings. The secret backdating of lower-level employees' option grants inflates these earnings, boosting the stock price and enabling executives to unload their stock at a higher price.

13. *How Backdating Hurts NVIDIA and its Public Investors.* Having shown that executives have various incentives to backdate their own and other employees' options, I will now describe three ways in which such option

---

[6] See Lucian Bebchuk and Jesse Fried, Pay Without Performance: The Unfulfilled Promise of Executive Compensation (Harvard, 2004).

backdating hurts NVIDIA and its shareholders. First, the extra (and hidden) compensation received by recipients of backdated options as a result of the options' lower exercise price comes directly at NVIDIA's expense, and therefore indirectly at public shareholders' expense. Second, the inflated stock price caused by backdating leads to a transfer of wealth from public investors to executives selling their shares in the open market. Third, if the secret option backdating is discovered, the company may be forced to pay additional taxes and other penalties, as well as bear litigation costs, which further reduces the firm's net worth and thereby indirectly hurts public investors.

14. *How NVIDIA's Measures Will Prevent Backdating.* I now turn to explain how certain measures contained in the settlement will prevent NVIDIA's executives from secretly backdating their own and other employees' options. The relevant measures can be classified into two categories: "substantive" and "procedural".

15. *Substantive measures.* NVIDIA's substantive measures prohibit the grant to executives and other employees of "in-the-money" options disguised as "at-the-money options" by (1) requiring that the exercise price of stock options be set to at least the stock's fair market value on the date of grant; (2) defining the date of grant as the date on which NVIDIA's Board or its Compensation Committee makes the determination granting such options; and (3) defining the fair market value of NVIDIA stock to be the closing price of the stock on the date of grant (or the previous trading day if the grant takes place on a day in which the stock is not traded). These

substantive measures will, if implemented properly, make the secret option backdating of executive and non-executive option grants impossible.

16. *Procedural Measures.* To ensure that the "substantive" measures are implemented properly, "procedural" improvements to the option-granting process are also required. The settlement provides a number of "procedural" measures designed to increase oversight and accountability in the option granting process.  These procedural measures include requiring (1)  that stock option grants to employees subject to either Section 16 of the Exchange Act or Section 162(m) of the Internal Revenue Code  be approved by a majority of the Board's independent directors or the Compensation Committee (and that stock option grants to non-employee directors be approved by a majority of the Board);  (2)  that the Company's General Counsel and/or Corporate Counsel attend all meetings where options are granted and prepare minutes of those meetings; and (3)  that if written consents are used to make option grants, the grantees, share amounts, and grant date will be specified in the document and signed or before the grant date.  In my view, these procedural measures will ensure that the substantive measures are implemented properly.  Together, the procedural and substantive measures will thus confer a benefit on NVIDIA and its public shareholders by preventing option grant backdating.

**The Settlement Reduces the Likelihood that NVIDIA Executives Will Manipulate Earnings**

17. The measures will confer an additional benefit on NVIDIA and its shareholders by reducing the likelihood of earnings manipulation not related to option backdating. Below, I explain why NVIDIA's executives may have an incentive to engage in earnings manipulation, discuss how such manipulation hurts NVIDIA and its shareholders, and show how NVIDIA's measures will reduce executives' incentive to engage in earnings manipulation.

18. *Executives' Incentive to Engage in Earnings Manipulation.* As I explained above, a company's reported earnings have a large impact on executives' wealth. First, executives' cash bonuses are typically at least partially based on reported earnings. Second, the price at which executives can unwind their shares is affected by reported earnings; higher reported earnings generally lead to a higher stock price. Thus, executives often have a desire to inflate a firm's reported earnings. Indeed, there is considerable evidence that executives frequently manipulate earnings in various ways.[7] One of the reasons why Congress enacted the Sarbanes-Oxley Act (SOX) in 2002, several years before the practice of option backdating came to light, was that evidence had emerged in 2000-2001 indicating that earnings manipulation was rampant during the previous decade.

19. *The Cost of Earnings Manipulation to Companies and Their Shareholders.* Such earnings manipulation can impose large costs on companies and their shareholders. First, to the extent earnings manipulation increases executives' bonuses and boosts the proceeds of their stock sales, it

---

[7] *See* Jesse M. Fried, "Hands-Off Options," 61 Vand. L. Rev. 453, 458 (2008).

transfers value directly from public shareholders to executives. Such value is a hidden form of compensation that is not approved or ratified by either directors or shareholders.

20. Second, earnings manipulation imposes a variety of costs directly on companies, and therefore indirectly on public shareholders. For example, companies that restated their financial statements following SEC allegations of accounting fraud from 1996 through 2002 collectively paid an extra $320 million in taxes as a result of overstating their earnings by $3.36 billion, so that executives could sell their shares at a higher price.[8] And Fannie Mae incurred over $1 billion in expenses cleaning up its books after giving its executives a compensation arrangement that encouraged them to manipulate earnings.[9]

21. *The Failure of the Sarbanes-Oxley Act (SOX) to Eliminate Earnings Manipulation.* As just noted, one of the purposes of SOX was to increase the accuracy of financial reporting by public companies. Among other things, SOX created a new government oversight board for the accounting industry and attempted to improve internal controls. SOX also contains a "clawback" provision: Section 304 requires the CEO and CFO of a firm forced to restate earnings to return to the firm any bonus or other incentive or equity-based compensation received within 12 months of the misleading financial statement, or any profits realized from the sale of stock during that period, if there is a finding of "misconduct." However, while

---

[8] *Id.*, at 468.

[9] *Id.*, at 468.

- 10 -

SOX may have reduced executives' ability to manipulate earnings, it has certainly not eliminated that ability. In 2006, four years into the post-SOX era, the number of earnings restatements filed by public companies reached an all-time record: 1876.[10] One reason why SOX may have failed to reduce earnings manipulation more substantially is that Section 304's clawback provision can be deployed *only* by the government, not by the board or shareholders. And to date, the government has invoked Section 304 only in a few cases, where the targeted executives were criminally convicted of fraud.

22. *How the Measures Reduce Executives' Incentive to Engage in Earnings Manipulation.* The Settlement imposes a clawback arrangement that enables NVIDIA's Board to seek disgorgement from NVIDIA's CEO and/or CFO of the after-tax value of any bonus payment they receive as a result of overstating earnings. This clawback is triggered if (a) NVIDIA is required to prepare an accounting restatement to correct an accounting error on an interim or annual financial statement included in a report on a Form 10-Q or 10-K due to material noncompliance with any financial reporting requirement under the federal securities laws, and (b) the Board (or a committee of independent directors) at the time of the restatement finds that part of the bonus payment received by the CEO or CFO would not have been received absent the accounting error.

23. The settlement-imposed clawback arrangement will reduce executives' incentive to manipulate earnings. It does so by decreasing the expected

---

[10] Id., at 459.

gain to them of such manipulation in two ways. First, the settlement-imposed clawback operates even if the federal government declines to invoke Section 304 of SOX.  Second, and just as importantly, the settlement-imposed clawback does not require a finding of "misconduct:" if there is a restatement, a bonus that is unearned must be returned.  This makes it easier to recover money from targeted executives. For these two reasons, the clawback arrangement increases the probability that an executive who manipulates earnings will be forced to return value to the company.  In my view, the additional risk of forfeiture created by the settlement-imposed clawback provides a significant benefit to NVIDIA by reducing the likelihood that NVIDIA executives will manipulate earnings, causing harm to the Company and its shareholders.

### Making Directors More Effective Representatives of Shareholders

24. In addition to eliminating option backdating and reducing the likelihood that NVIDIA executives will manipulate earnings, the measures will give NVIDIA's Board greater ability and incentive to represent public shareholders' interests.  Most importantly, NVIDIA agrees to: (1)  ensure that at least 75% of the directors are considered "independent";  (2) appoint and empower a lead independent director; (3) limit the number of public company boards NVIDIA directors can sit on; and (4) require NVIDIA directors to hold a minimum amount of equity in NVIDIA.  I discuss in turn each measure, explaining why it will benefit NVIDIA and its shareholders. I then explain why these board-related measures, together with the

compensation-related measures discussed earlier, can collectively be expected to increase NVIDIA's stock price by improving corporate governance at NVIDIA.

25. *Super-Majority of Independent Directors.* The settlement requires that at least 75% of the directors be considered "independent" (under a standard, set out in the settlement, that is based on (but tighter than) the standard used by NADSAQ). Institutional investors have long believed that the presence of independent directors on public company boards improves the ability of these boards to monitor management on shareholders' behalf. The intuition is simple: directors who are employees of the firm, or affiliated with companies that do business with the firm, are beholden to the firm's top executives. Such non-independent directors cannot be counted on to oversee (and, if necessary, replace) the firms' top executives. Independent directors can thus be expected to a better job. And while the evidence that the presence of independent directors improves corporate performance is largely inconclusive, the presence of such directors does appear to reduce the likelihood of accounting-related manipulation, such as backdating.[11] As I indicated earlier, the settlement measures targeted at backdating make it highly unlikely that NVIDIA will engage in that specific form of manipulation. But increasing the number of independent directors on the Board may well reduce the likelihood that NVIDIA executives will engage in other forms of accounting manipulation, thereby providing a benefit to NVIDIA and its shareholders.

---

[11] See Jesse M. Fried, Option Backdating and Its Implications, 65 Washington & Lee L. Rev. 853, 870-71 (2008).

26. *Appointment of an Empowered Lead Independent Director.* The settlement requires the appointment of a Lead Independent Director. The Lead Independent Director would be responsible for coordinating the activities of the independent directors, including (a) scheduling Board meetings; (b) shaping the agendas for Board and committee meetings (based on input from directors and management), (c) assessing for the Board the quality, quantity and timeliness of information coming from management; (c) recommending membership of Board committees and the selection of committee chairs; (d) coordinating, developing the agenda for, and moderating executive sessions of independent directors; and (e) acting as a liaison between the independent directors and Board chair and/or the CEO on sensitive issues. To carry out these tasks, the lead independent director is authorized to retain attorneys or consultants (or to delegate such responsibility to committees or their chairs).

27. The appointment of a lead director makes it more likely that the independent directors will be able to effectively oversee management. In the absence of a designated lead independent director, each independent director may look to the others to take a leadership role in dealing with executives, with the end result that no independent director comes forward to challenge executives. The appointment of a designated lead director avoids this "collective action" problem, thereby increasing the power of independent directors on the board. It is thus considered a "best practice" by corporate governance experts – and one that firms are under mounting pressure on adopt. In my view, the appointment of a suitably

empowered independent lead director, as required by the settlement, will confer yet another important benefit on NVIDIA and its shareholders.

28. *Restricting Service on Multiple Boards.* The settlement requires directors to serve on no more than four public company boards. "Busy" directors – those with many other board commitments – are less likely to devote sufficient time and attention to their duties on NVIDIA's board. Indeed, there is considerable evidence that "busy" directors are less effective monitors of management. One academic study found that the likelihood of accounting fraud is positively related to the average number of directorships held by outside directors.[12] Another found that busy directors are more likely to award high levels of CEO compensation, hurting firm performance.[13] As a result, both the National Association of Corporate Directors and the Council for Institutional Investors have called for limits on the number of directorships held by directors of public companies. The academic studies described above thus suggest that the limitation on outside directorships imposed by the settlement can be expected to provide an important benefit to NVIDIA and its shareholders.

29. *Minimum Equity Holding Requirement for Directors.* The settlement requires that at least 50% of each non-employee directors' compensation consist of equity in the company (common stock or stock options), and that each such director hold at least 25,000 shares of stock (including vested

---

[12] See M.S. Beasley, "An Empirical Analysis of the Relation Between the Board of Director Composition and Financial Statement Fraud," 71 Accounting Review 443 (1996).

[13] See J. Core, R. Holthausen, and D. Larcker, "Corporate Governance, Chief Executive Officer Compensation, and Firm Performance," 51 J. Fin. Econ. 371 (1999).

options).  When directors own more stock, they have a greater financial incentive to make value-increasing decisions and monitor management. Not surprisingly, there is considerable evidence that higher levels of director stock ownership are associated with better firm performance.[14] Indeed, one recent study finds that the most important single step firms could take to improve corporate governance is to increase directors' stock ownership.[15] In my view, the director equity holding requirement imposed by the settlement will provide a significant benefit to NVIDIA and its shareholders.

**Effect of Settlement-Imposed Measures on Shareholder Value**

30.   The settlement-imposed measures will prevent the backdating of executives' options, reduce executives' incentives to manipulate earnings, and improve the ability and incentive of NVIDIA's independent directors to monitor management on behalf of public investors.  While it is difficult to predict precisely the collective effect of these measures on NVIDIA's performance and stock price, there is considerable evidence that better corporate governance is associated with better firm performance and greater shareholder value. This leads me to believe that the settlement-imposed measures will, collectively, have a meaningful effect on NVIDIA's

---

[14] For example, Sanjai Bhagat and Brian Bolton find a positive correlation between the median director's stock ownership and firm operating performance the following year. See Bhagat and Bolton, "Corporate Governance and Firm Performance" (working paper, 2007).

[15] Id., at 31.

stock price. Below, I review some of the studies finding a link between corporate governance and shareholder value.

31. *Academic studies*. In a 2003 study,[16] Paul Gompers, Joy Ishii, and Andrew Metrick found that a strategy of buying firms with the strongest governance and selling firms with the weakest corporate governance during the 1990s yielded abnormal (market-adjusted) returns of 8.5% annually. The study, which looked at 1500 large firms, also found that a relationship between stronger corporate and higher firm value, higher profits, and higher sales growth.

32. In a 2006 study,[17] Lawrence Brown and Marcus Caylor studied over 2000 firms and found that firms with better corporate governance arrangements had better operating performance, higher valuations, and larger cash payouts to investors. Among the factors considered in determining the quality of a firm's governance arrangements were (1) the existence of a lead independent director if the CEO and Board Chair are not separated; (2) limitations on the number of other public company boards on which the firm's independent directors could sit; (3) the use of stock to pay at part of directors' fees; (4) a requirement that directors and officers hold a certain amount of stock. All of these measures, it is worth noting, were put in place by the NVIDIA settlement.

---

[16] Paul Gompers, Joyce Ishii, & Andrew Metrick, Corporate Governance and Equity Prices, 118 Q. J. Econ. 107-155 (2003).

[17] Lawrence D. Brown & Marcus L. Caylor, Corporate Governance and Firm Valuation, 25 J. Acct. & Pub. Policy 409 (2006).

33. *Institutional Investors.* A 2002 Global Investor Opinion Survey by McKinsey & Company reported, based on responses of 200 institutional investors, that such investors are willing to pay significantly more for companies that have better corporate governance.[18] A majority of institutional investors in North America responding to the survey indicated that corporate governance was as or more important than financial indicators in determining whether to buy the firms' stock. Over 75% of these investors indicated that they would pay a premium for U.S. firms with good corporate governance, with the average premium being 14%.

34. According to institutional investors responding to the McKinsey survey, three of the four top reform priorities were (1) making boards more independent; (2) making board practices more effective; and (3) improving the performance-sensitivity of both director and executive compensation. Notably, the settlement-imposed measures discussed above accomplish all three of these objectives.

35. NVIDIA's current market capitalization is approximately $4.5 billion. As I indicated earlier, I cannot predict precisely how the settlement-imposed measures will affect NVIDIA's stock price. But if investors are willing to pay 14% more for good corporate governance, and the settlement-imposed measures changed NVIDIA's corporate governance rating from "bad" to "good," NVIDIA's market capitalization would be expected to increase significantly.

---

[18] McKinsey & Company, Global Investor Opinion Survey on Corporate Governance, 2002.

36. A 2005 report by Deutsche Bank[19] studying 2000 companies over a 5-year period came to a similar conclusion: "[T]he influence of corporate governance standards on a company's long-term equity performance is beyond doubt." The study also found that the stock prices of firms with improving corporate governance outperformed the stock prices of firms with deteriorating corporate governance during an 18-month period ending shortly before the report was published. This finding provides further reason to believe that the improvements in corporate governance brought about by the settlement-imposed measures will, everything else equal, lead to a higher stock price.

37. The measures imposed by the settlement will substantially improve corporate governance at NVIDIA. These measures are valued by institutional investors, and have been shown to correlate positively with better operating performance, higher valuation, and larger cash payouts to investors. While it is impossible to put an exact dollar value on the benefits conferred by the settlement-imposed measures, the studies described above suggest that they could easily increase NVIDIA's market capitalization by tens or hundreds of millions of dollars.

**Conclusion**

38. I have reviewed and assessed the proposed executive compensation and corporate governance measures implemented through the NVIDIA

---

[19] Deutsche Bank, Beyond the Numbers: Material of Corporate Governance, November 2005.

derivative litigation settlement to determine whether these measures provide substantial benefits to NVIDIA and its public shareholders. In my view, these measures, if implemented diligently and in good faith, will (1) eliminate the possibility of option backdating at NVIDIA; (2) reduce the likelihood that NVIDIA executives will manipulate earnings; and (3) significantly increase the incentive and ability of NVIDIA's Board to monitor management on behalf of public shareholders.  The available evidence suggests that these types of measures collectively could increase NVIDIA's market capitalization by tens or hundreds of millions of dollars. For these reasons, my opinion is that the measures would provide substantial benefits to the Company and its shareholders.

*Jesse Fried*

_____
JESSE M. FRIED